Miller *v.* Gable.

MILLER and others, *appellants, vs.* GABLE and others, *respondents.*

Where property is conveyed to a religious corporation, (or to a religious society which afterwards becomes incorporated,): to promote the teaching of particular religious doctrines, and the funds are attempted to be diverted to the support of different doctrines, it is the duty of the court of chancery, under its general jurisdiction over trusts, to interpose for the purpose of carrying the trust into execution according to the intention of the donors. *Semble.*

It is not a defence to a suit brought to enforce such a trust, that the deviation from the faith and doctrine to which the property was devoted by the donors, is sanctioned by a majority of the church or congregation, who, through trustees chosen by such majority, are administering the trust according to their views. *Semble.*

In the case of a clear violation of a well defined trust of this character, the court would be bound to interfere upon the complaint of a minority against a majority of the congregation. *Semble.*

In ascertaining the purposes to which property conveyed to a church was intended to be devoted, the language of the conveyance, if clear and unequivocal, is conclusive. If the language is indefinite, extrinsic evidence, such as the tenets held by the donor, or the faith then actually taught by the donees; and the circumstances under which the gift was made, is admissible in ascertaining the intention. *Per* GARDINER, *President.*

Land was conveyed to trustees in 1765, for the use of a church known as the German Reformed Church of the city of New-York, which was Calvinistic in doctrine, and in the declaration of trust, was called the Calvinistic Church in the City of N. Y., worshipping in the German language; which declaration of trust stated that the property was purchased by contributions from certain German and Swiss inhabitants of the city of New-York, *with the assistance of divers charitable and well disposed persons,* as a site for a church *for the worship of God,* and that all parties were inclined to preserve the estate in all times coming, for the pious uses aforesaid. The trust so created is not limited to the exclusive use of a congregation holding the doctrines denominated Calvinistic: and such trust is not violated by the application of the property by a majority of the congregation, to the maintenance of public worship according to the doctrines of any other evangelical denomination of Christians. *Per* GARDINER, *President.*

And where the church referred to in such declaration of trust, though formerly independent, was then connected with the Reformed Dutch Church, and had become subordinate to the ecclesiastical judicatures of that church, and continued so connected for several years, after which the connection was suspended, and again renewed, and finally broken off; and a majority of the congregation devoted the property to the maintenance of its worship as an independent church, though a minority adhered to the connection with the Dutch Church: *Held,* that there was no violation of the trust.

A religious society, subordinate to church judicatories, declares itself independent,

Miller *v.* Gable.

and becomes incorporated under the general act, and then purchases land, which is conveyed to the corporation ; such corporation is entitled to administer the estate so purchased independently of such church judicatories. *Per* BEERS, *Senator.*

Where a church organized on the basis of *independency*, afterwards unites with the organization of another church, by becoming subordinate to its judicatories, such union, so far as the temporalities are concerned, is binding only so long as the parties to it mutually consent to its continuance. *Per* GARDINER, *President.*

The *denominational name* of a religious corporation or society, to which a donation is made, and *the doctrines actually taught* therein at the time of the gift, may be resorted to in order to limit and define the trust in respect to doctrines usually considered fundamental, such as those in dispute between *trinitarians* and *unitarians ;* but not as to lesser shades of doctrine. *Per* GARDINER, *President.*

Trustees of an incorporated church cannot be divested of the temporalities, on the ground that they are used to pay the salary of a minister holding doctrines repugnant to the tenets of the church, but who has been chosen by the body authorized to select the ministers—it being no part of the duty of the trustees to call the minister, but only to pay the salary of the minister regularly called by the proper authority. *Per* BEERS, *Senator.*

The question whether a conveyance of property for the support or propagation of principles hostile to the Christian religion can be upheld in this state, discussed *by the assistant vice chancellor in the court below.*

APPEAL from the court of chancery. The respondents, Henry Gable and five other persons claiming to be trustees of the religious corporation called " The Corporation of the German Reformed Church in the City of New-York," filed their bill in behalf of themselves and the other trustees and corporators, against the appellants, who, it was suggested, claimed to be trustees, and were in possession of the temporalities, for a surrender of the estate, property and books of the church, and for an account of what the defendants had received, and also for a perpetual injunction against their further intermeddling with the temporal concerns of the church, and against allowing the pulpit to be occupied by any minister not in connection with the Reformed *Dutch* Church. The bill stated that the German Reformed Church of the city of New-York, represented by the complainants, was a component part of the Reformed Dutch Church in North America, and in common with that church, professed the distinctive doctrines and practised the religious rites set forth and promulgated by the National Synod of Dort, held in the years 1618 and 1619, and that the doctrines so held

are distinguished as *Calvinistic*, in opposition to another class of doctrines denominated *Arminian ;* that these doctrines are not reconcilable with each other, and that the principles involved in them are deemed to contain some of the fundamental principles of Christianity, and constitute terms of communion in the denominations by which they are respectively held, and that the members of the Reformed Dutch Church, including the legitimate members of the church represented by the complainants, cannot conscientiously commune with Arminians; that the Reformed Dutch Church in North America, by its constitution adopted in 1772, recognized and declared the doctrines, rules and usages, proclaimed by the Synod of Dort, and organized itself as a religious body in the following form : each separate church is governed by a *consistory* composed of the minister, elders and deacons, from which an appeal lies to the *classis*, a body consisting of representatives from the several churches under its charge ; that the several classes send delegates to a *particular synod*, which is the next judicatory in order, from which latter body an appeal lies to the *General Synod*, as a tribunal of the last resort, and that no particular church, or its members or officers, can lawfully withdraw from the connection ; and also, that pastors and ministers of the several churches are provided and are required to be approved by the *classis* to which the particular church is subject. It also stated that the church represented by the complainants sent delegates to the assemblies which agreed upon the constitution of the Reformed Dutch Church, and that it was attached, and made subordinate to the classis of the city of New-York. That before its incorporation, which took place under the general act, in 1784, the members of this church contributed towards the purchase of a site for, and the erection of, a church edifice on Nassau-street, and shortly after its incorporation, it became the purchaser of a number of lots in the upper part of the city, now on Forsyth-street, and procured the same to be conveyed to the trustees ; and that in 1822, the church building on Nassau-street was sold by the corporation, and the proceeds of the sale, with an additional amount contributed by the congregation, were expended in the erection

of a new church on a part of the lots on Forsyth-street. During this time, and until 1825, it is alleged that the church in question was connected with, and constituted a part of, the Reformed Dutch Church, and that the several donations and contributions above mentioned, were made with a view to inculcate the doctrines set forth in the acts of the Synod of Dort, and in the standards of the Reformed Dutch Church. That in 1825, a portion of the congregation made an application to the classis to dissolve the connection between this church and the Reformed Dutch Church, but the classis withheld its consent, and the congregation submitted, and that the classis has never at any time renounced its authority over the church, though it is admitted that in consequence of difficulties and divisions in the congregation, the classis, for a considerable time prior to the commencement of this suit, had suspended the active exercise of its jurisdiction over the church, and during that time ministers were—by the defendants and their adherents—irregularly called and employed, who were not appointed or recognized by the Reformed Dutch Church, and some of whom were independent in respect to church government, and others belonged to denominations not in communion with that church, but were ministers of the Lutheran church, and held doctrines essentially differing from those of the Reformed Dutch Church, and which are distinguished as Arminian; and that such ministers were paid out of the funds of the church; and that supplies regularly provided and approved by the classis were not permitted to officiate as ministers in the church; and furthermore, that the defendants, and those acting with them, have declared themselves a free church, and have devoted the temporalities to the support of doctrines incompatible with the standards of the Reformed Dutch Church; and that the defendants and their adherents, by indiscriminately admitting members of the congregation who would co-operate with them, having acquired a nominal majority of the worshipping members of the church, in the month of May, 1837, in order to secure a majority in the board of trustees, illegally procured a resolution to be passed reducing the number of the trustees from nine to six, and thereupon cut off three of

the members of the board of trustees who adhered to the doctrines of, and the connection with, the Reformed Dutch Church; whereupon the complainants, being a majority of the legal trustees, and those acting with them, proceeded to complete a reorganization of the congregation in conformity to the doctrines, worship and government of the Reformed Dutch Church, but their opponents afterwards abandoned the resolution reducing the number of trustees; that the board of trustees recognized, by those who adhered to the complainants, filed a bill in the court of chancery against the opposite party, but owing to some informality in not bringing the proper parties before the court, the complainants were advised that they could not prevail, and they therefore voluntarily consented to the dismissal of the suit, but the defendants, by force of some interlocutory orders which had been made in the progress of the cause, in the month of December, 1838, obtained the temporary possession of the church in Forsyth-street, and of all the temporalities, including the seal and the books and papers, and that they have from that time hitherto held the possession of the same, avowedly for the worship of an independent congregation, wholly disconnected with the Reformed Dutch Church and its judicatories, and that they claim the right to introduce whatever doctrine, worship and church government a majority of the members shall think proper. That during the pendency of that suit, the members of the congregation adhering to the complainants, memorialized the classis of the city of New-York for aid and direction in the premises, and that the classis thereupon, by resolution, re-asserted its jurisdiction over the church, and appointed a temporary supply for the pulpit. The complainants claim that they are the majority of the true and only legal board of trustees of the church, although reduced in number by the defection of the other trustees, who refuse to act with them; and that the complainants, and those who adhere to them, are the true and only legitimate successors of the said German Reformed Church; and that the defendants pretend that *they* are the legal board of trustees, and that they, and those who adhere to their party, are the legitimate corporators, and that they keep and withhold the

temporalities, which are stated to be of the value of over fifty thousand dollars, from the complainants.

The defendants put in their joint and several answer, in which they admit that they claim to be, and insist that they, and four other persons who are named are, the legal trustees of the corporation of the German Reformed Church in the city of New-York. They deny that for sixteen years last past the church which they claim to represent has had any connection with the Reformed Dutch Church of North America, and say that the connection which at one time existed was dissolved and put an end to about the year 1823, and they insist that such connexion was wholly voluntary, and that their church had a right to withdraw from such connection whenever it saw fit; but if this were otherwise, that the Reformed Dutch Church has forfeited its rights over them by non user. They admit that the doctrines denominated Calvinistic and Arminian are somewhat variant, but not, as they think, irreconcilable or repugnant to each other; and they say that the church which they claim to represent is exceedingly liberal and tolerant in its faith and practice, and that a sincere belief in the cardinal principles of the Christian religion and a pure and unspotted life, is sufficient to admit candidates into communion with that church; that pastors and preachers are chosen by the votes of the pew-holders and members of the congregation, with the approbation of the consistory and board of trustees; that the said church has at various times, of its own will and choice, connected itself with other ecclesiastical bodies, always reserving the right of selecting their own pastors and ministers, and that during a large portion of the time since the foundation of their church, it has been unconnected with any other religious body. They set forth the manner of choosing trustees and members of the consistory and of calling their ministers, which last is done by the concurrence of the congregation, the consistory and the trustees. They admit the contribution of moneys for the erection of the church in Nassau-street, the purchase of the lots on Forsyth-street, and the erection of a church thereon and the incorporation of the church at the time stated in the bill of complaint; but they deny that

the church in Forsyth-street was erected "for the sole and selfish accommodation of the strict members of the German Reformed Church," or as a component part of the Reformed Dutch Church. They admit the calling of several ministers, who from time to time occupied the church in Forsyth-street, without reference to the classis of the Reformed Dutch Church, but they allege that such ministers preached the doctrines and inculcated the faith of the German Reformed Church, as accepted, practiced and believed by the congregation of that church, and as they believe according to the original foundation thereof, and they admit the rejection of supplies tendered to them by the classis at the instance of the party represented by the complainants. The defendants also admit the passage of a resolution by the congregation in May, 1837, reducing the number of the trustees from nine to six, and the deposing of three of those who were then trustees, including two of the complainants, and they say that this was done in the belief that it was authorized by law, and for the reason that the deposed members were considered to be morally unfit to hold their situations; but they state that it having been afterwards decided by the vice chancellor of the first circuit that the measure was illegal, they acquiesced and restored the three members, which gave to the party of the complainants a majority, until the 4th of June, 1838, when the terms of office of three trustees in that interest expired and others were chosen in their places, and that the term of office of another trustee in that interest expired on the 8th of June, 1839, and that the present board of trustees consists of such as were before trustees and of those so chosen in the places of the trustees whose terms had then expired. The answer then states instances of maladministration and misappropriation of the funds on the part of the party adhering to the complainants while they held the majority of the board of trustees, and proceeds to set up the order made by the vice chancellor in the former suit mentioned in the bill, as a bar to the relief now sought, the particulars of which it is unnecessary to state. The attempt again to connect the church with the Reformed Dutch Church by means of an application to the classis is admitted, and the defendants also admit that they claim that

Miller *v.* Gable.

the church is an independent German Reformed Church, free from the ritual or temporal jurisdiction of any other ecclesiastical body whatever. An account is given of the property possessed by the corporation, which is admitted to exceed in value the sum of $50,000. The other material matters stated in the bill of complaint are either denied, or met by allegations that the defendants are ignorant concerning them.

A replication having been filed, proofs were taken at great length by each of the parties. The first notice of the church in question contained in its records, was an entry dated October 28th, 1763, of the proceedings of a meeting of the consistory, composed of certain elders and deacons and of several members of the congregation, held " on the occasion of the arrival of the Reverend Johann Michael Kern from Germany, as minister of God's word to the German Reformed congregation in New-York," at which it was resolved, " That to prevent all contentions we unite with the classis of Amsterdam or the synod of Holland, and that the Low Dutch ministers Dom. Ritzema and De Ronde be conferred with in order to carry this resolve into execution." It was also resolved that Dominie De Ronde should prepare a proper report " according to the order of the Low Dutch Church necessary for the above application ;" and that the salary of the Rev. Mr. Kern should be one hundred pounds until the debts of the church should be paid, when the salary was to be raised to one hundred and fifty pounds. The *call* of the Rev. Mr. Kern, signed by the elders and deacons, witnessed by L. De Ronde and accepted by Mr. Kern, next occurs in the records, under the date of January 25th, 1764. It requires him "to preach God's word truly and faithfully, to administer his holy sacraments, *to explain the Heidelberg Catechism*, to administer the discipline of the church ; in one word, to do all that becomes a faithful servant of Jesus Christ, according to his holy word and as the order of the church may demand." On the 18th of June following another meeting of the consistory was held, when, it is stated, that Dom. Kern informed the meeting that the two Dutch ministers Ritzema and De Ronde had invited him, Mr. Kern, to attend a " conferential meeting," to be held

the following day.   Dom. Kern rehearsed the proceedings of the consistory of the 28th of October preceding, above mentioned, and stated that "now was the time for them according to their knowledge and conscience to give their votes on the subject." It was thereupon resolved unanimously, "that subordination to the classis of Amsterdam is for the good of the church, better than it, in an independent state, can be kept." At the same time certain credentials were signed, authorizing Dom. Kern and one of the elders " to appear in our behalf before the honorable classis of Amsterdam, to deliberate, advise and conclude with the assembled ministers and elders, what the word of God and the regulations of our dearly beloved church may recommend for the present as well as for the future welfare of the whole Low Reformed Dutch Church in this province and ours in particular." These proceedings appear to have reference to a meeting of the Low Dutch ministers and elders connected with the classis of Amsterdam, to be held in the city of New-York.   The next entry in the records bears date March 8th, 1765, and states that all the members of the present as well as the former consistory, with the members of the congregation, assembled on that day in the presence of a goodly company, to lay the first stone of the church, and that the same was laid by their pastor, the Rev. Mr. Kern, (who it is stated was born at Manheim,) and who accompanied the act with certain sentences from the scriptures, and concluded with these words, " In the house built upon this stone, the word of the Lord must always be preached truly and faithfully, *according to the Reformed doctrine of Heidelbergh and Switzerland.*"   Foundation stones, it is said, were then laid by every member of the consistory and congregation present, with the exclamation, "for a German Reformed Church."

A paper in the form of a bond, dated 13th July, 1765, was given in evidence, purporting to be the deed of four individuals, running to the Rev. J. M. Kern, "minister of the gospel and present pastor of the Calvinistic church in the city of New-York worshipping in the German tongue," and to several other individuals described as the elders and deacons of the said church, reciting that certain building lots on Nassau-street therein de-

Miller *v.* Gable

scribed had been purchased, by certain German and Swiss inhabitants of the city of New-York, with the assistance of certain charitable and well disposed persons, and on which they had begun to erect a church for the worship of God, which lots had been conveyed to the obligors, and that all parties were inclined to preserve the said estate at all times coming for the pious uses aforesaid, and conditioned that the obligors should hold the same as trustees to the uses aforesaid.

A document prepared with a view to obtain pecuniary relief from, and addressed to the classis of Amsterdam, authenticated by the signatures of the minister, elders and deacons, in July, 1766, containing a narrative carrying back the history of the church to its origin, anterior to the commencement of the records, was given in evidence. It is stated in this paper, that a considerable number of Germans had immigrated to the city of New-York at an early day, some of whom who had acquired the language of Holland attached themselves to the Low Dutch Church, and others, who were unacquainted with that language, "found themselves compelled to hear the preaching of God's word in the German Lutheran Church." "This deplorable condition," they say, "induced those who had resided here some years to reflect whether some plan might not be devised to establish the worship of God in their mother language. After a careful collection of the German Reformed members, and a subscription of what each one was willing to contribute annually, for the support of a preacher, it was found that this object was attainable." The document proceeds to state that a building, which had been used for a brew-house, and also for a theatre, was purchased and fitted up for a place of worship, which brought the congregation in debt £800. They however employed a preacher, one Dominie Rosencrantz, who had fled for his life to New-York, on account of the inroads of the Indians in 1758. He preached one year and then returned to his former congregation, which had re-assembled ; and the church in New-York employed the Rev. William Kalls, who had been stationed on the Raritan, who preached one year, but failed to give satisfaction on account of his irritable temper. After a vacancy of

nearly half a year, the Rev. Frederick Rothenhergler, "a reformed preacher," a stranger to them, came over in a ship which arrived in the bay towards the spring of 1761. After preaching one year on trial, he required and received a written call, but soon after, as the paper states, "conducted himself in the pulpit in direct contradiction of the injunction, 'Feed the flock of Christ, but not as those who lord it over God's house;'" upon which the congregation were compelled to use legal means to rid themselves of him. They resolved to act more cautiously for the future, and for this purpose sent a written communication to the consistory of Heidelberg, requesting them to send the congregation a suitable candidate for the ministry. This resulted in the sending out the Rev. Dom. Kern, who arrived towards the end of 1763. "Scarcely had he arrived and become acquainted with the affairs of this church, by the assistance of the elders and deacons whom he had assembled around him as his advisers, than *he represented to them that independency in churches was very dangerous both to the church and pastor, and did not rest until the resolution was passed to form a connection of this church with the Rev. classis of Amsterdam."* The paper goes on to state that a deep fall of snow, in the winter of 1764-5, caused the walls of their church edifice to spread so that they did not dare to worship in it, but erected a new one at the cost of £1151, making their whole debt £1951, of which they had raised £600 by collections and contributions, and that the balance remained unpaid. "We therefore," they conclude, "indulge the confident hope that your Rev. classis will make us, *as a church in subordination to your classis,* the object of your paternal affection, and exhibit yourselves towards us as kind and affectionate fathers." No pecuniary relief was obtained from Holland, but the debt was probably paid, as it is not afterwards referred to in the records or testimony.

Dom. Kern having accepted the charge of another congregation, the Rev. Mr. Foering was called in March, 1772. The only allusion to doctrinal subjects in his call is contained in a sentence in which he is required "to instruct the elder children according to the Heidelberg Catechism, so that they may as

soon as possible become members of the church." He was in-stalled by a minister of the Low Dutch church.

The Low Dutch churches in this country, in the year 1772, agreed upon a plan of union among themselves, and a consti-tution which provided for the organization of a system of church judicatories, in correspondence with the ecclesiastical bodies of the mother church in Holland. The Rev. Mr. Foering and, another individual, as delegates from the German churches, pur-suant to written credentials signed by the elders and deacons, assented to and signed the articles of union in behalf of their church. One of the articles was in these words: " We adhere in all things to the constitution of the Netherlands Reformed Church, as the same was established in the church orders of the Synod of Dordrecht in the years 1618 and 1619."

In December, 1773, an elder of the church was found to be (as stated in the minutes,) "unsound in the doctrines of our Protestant Reformed church, to wit, as having denied the doctrine of election, and holding also that outward baptism is the new birth," &c. and was thereupon deposed and another was chosen in his place.

The Rev. J. G. Gebhard was called to succeed the Rev. Mr. Foering, in September, 1774. He was elected by a vote of the congregation, and received a written call from the consistory, which prescribed his duties. He was to preach in German twice every Sunday, and also on Wednesday evening. On Sun-day morning the text was to be taken from the Bible, "and in the afternoon the sermon to be from the Heidelberg Catechism," and he was to teach the youth "diligently from the Heidelberg Catechism, so that they may be prepared to be members of the church." He accepted the call and was installed, but subse-quently declined the situation. It appears by the minutes of the classis that the church in question was represented at its several meetings in the years 1773, 1774, and 1775.

The congregation was dispersed, and public worship in the church was, for the most part, discontinued during the revolu-tionary war, though there are some traces of its existence du-ring that period, under the charge, it is believed, of the Hessian officers. In 1783, there is an entry on the records of the consis-

tory, to the effect that the Rev. J. D. Gros, of Canajoharie, had been called to preach for them ; and it appears that he officiated as pastor some time after the close of the war.

In May, 1784, there was a meeting of the consistory of the German Church, held at the request of the Rev. Dr. Livingston, to consider whether the congregation would attach itself to the judicatories of the Low Dutch Church. "After mature consideration," it is stated, "it was unanimously concluded never to vote for such a union ; and the following reasons of it have been specified in this protocol for the information of posterity: *Firstly*. Though it may be that preachers and elders of this High German Reformed Church have been present in such assemblies, or that this congregation has been entered into the protocols of the said assembly ; in the way of law and right, this congregation ought to be independent of all churches of other nations and languages. *Secondly*. That such a union never has to its purpose the best interest of this congregation, the same being too weak, even in company with other High German Reformed congregations, to have any influence in the said church assembly, where languages are spoken which we do not know, where we are always opposed in getting into the administration, and where we are not permitted to speak our own language. *Thirdly*. That it would be best for this congregation, and for the High German Church in general, to establish a union of High German congregations, as soon as this church shall contain a larger number of preachers." A committee was appointed to return this answer to Dr. Livingston, who reported that they had performed that duty. At the same meeting it was determined to have the church incorporated, which was accordingly done, and the certificate was recorded June 11th, 1784, the number of the trustees being fixed at nine. On the 2d of November following, the property in Forsyth-street was conveyed to these trustees by name, who were described as "Trustees of the Corporation of the German Reformed Church of the city of New-York."

On the 6th May, 1795, the Rev. Phillip Milldoller, a member of the *German Reformed Synod* of Pennsylvania, was invited by a written call from the consistory, to assume the pastoral

charge of the church in question. The document was signed by the elders and deacons, and the chairman and secretary of the board of trustees, and contains a clause respecting the teaching of the Heidelberg Catechism, similar to those before referred to. He accepted, and accordingly became the minister of the church. Sometime after accepting the call, he changed his ecclesiastical relation, and became a member of the New-York classis of the Reformed Dutch Church.

In September, 1797, the classis of the city of New-York entered in its minutes a statement that the German Reformed Church of the city of New-York having united with the Reformed Dutch churches in the organization of 1772, and having been represented by their ministers and elders until the commencement of the then late war, the classis was willing to consider the church as one of its members, and thereupon directed a copy of the minute to be transmitted to the Rev. Mr. Milldoller, to be communicated to the consistory. The subject was not acted on by the consistory until December, 1799, when, notwithstanding the resolutions of 1784, it was unanimously determined to accept the invitation of the classis; and accordingly Mr. Milldoller, having first obtained the consent of the German Reformed Synod of Pennsylvania, to which he then belonged, appeared at the meeting of the classis held in September, 1800, with his elder, and they were received as representatives of the church. From this time to the year 1805, a regular connexion appears to have been maintained between the church and the classis, the latter receiving representatives from the church, approving the calls of its ministers, and mediating between the parties when controversies arose. After 1805, there is no evidence of any connexion or correspondence with the classis, until April, 1810, when the consistory and the trustees addressed a memorial to the classis, in which they state that they conceive that the church is not withdrawn from their protection, inasmuch as there has never been any regular discharge ; that a Mr. Runkel has been introduced into the church as minister without the approbation of the classis, that he is unsound in doctrine, and otherwise unsuitable to officiate, and they ask the interposition

of the classis for their relief. Delegates to the classis were at the same time appointed, one of whom presented himself at a meeting of that body held shortly afterwards. The minute of the classis states that a difficulty occurred " whether that congregation belongs to this classis," but after some discussion it was determined that it did, and a committee was thereupon appointed to mediate between the parties respecting a contention which was found to exist. (*a*) From 1810 to 1823, the connexion appears to have existed, the church being frequently, but not uniformly, represented in the classis, and the authority of the latter being often invoked to adjust difficulties and contentions. During this interval the Rev. Mr. Dreyer, a member of the Synod of the German Reformed Church in the United States, was settled pursuant to a written call subscribed by the elders and deacons. It stated that he was " to fulfil the full work of a gospel minister agreeably to the word of God and the excellent rules and constitution of our Reformed Dutch Church, *established in the last Synod held at Dordrecht,* and ratified and explained by the ecclesiastical judicatory under which we stand." He was also *to explain the Heidelberg catechism* on the Lord's days. In 1822, the trustees contracted for the building of a new church edifice on their property on Forsyth-street, the church on Nassau-street having been sold.

In July, 1823, a representation was made to the classis that the consistory and trustees contemplated withdrawing from the Dutch Church and connecting themselves with the German Lutheran Church, contrary to the wishes of a majority of the congregation, upon which the classis resolved not to consent to a dismission of the church from its authority, and appointed a committee to inquire into the matter. At a meeting of the classis held in October following, the persons claiming to be the existing consistory, applied to the classis to be dismissed from that connection, and transferred to the German Reformed Synod of

---

(*a*) See *The People* v. *Runkel,* (9 *John.* 147,) where the details of that controversy are given.

the United States; and at the same time the committee above mentioned reported that the parties in the church appeared to be in a state of "irreconcilable dissension." Various measures were then, from time to time, adopted by the classis to restore quiet and order in the church, but without success; and in October, 1825, the committee charged with that subject reported that they were informed by the officiating minister, that the church did not consider itself connected with any congregation, and the committee gave it as their opinion that any attempt at present to reunite them to the classis, would prove unavailing. The report was accepted, and nothing further appears to have been at that time done to preserve the connection between the German church and the classis.

In March, 1838, a large number of the members of the congregation attached to the party represented by the complainants, petitioned the classis to take the church under its protection, and to appoint supplies to the pulpit until a pastor should be settled. The classis, in accordance with the prayer of the petition, again asserted its jurisdiction over the church, and appointed a temporary supply for the pulpit. The former suit mentioned in the pleadings being then pending, and the temporalities being in the hands of a receiver, pursuant to an interlocutory order, both parties applied by petition to the vice chancellor of the first circuit, before whom it was pending, to have the church opened for their respective ministers, the complainants desiring that the ministers appointed by the classis should be admitted. The vice chancellor, by an order made on the 28th August, 1838, denied the prayer of the complainants' petition, but granted the motion made on behalf of the defendants—directing the receiver to open the church for divine service under the direction of the trustees adhering to the party of the defendants, and for the use of the trustees and consistory in that interest. The defendants petitioned for a dismissal of the bill in the last mentioned cause, and all parties consenting thereto, and only submitting to the court upon what terms such dismissal should be made, the vice chancellor, on the 17th December, 1838, made an order dismissing the bill, and directing that the temporalities, including the possession of the

church, should be delivered to the persons in the interest of the defendants claiming to be the then present board of trustees.

From the time the actual connection with the classis ceased, in 1823, the ministers occupying the pulpit of the German church were the Rev. Mr. Knouse, who officiated until 1829, and was succeeded by the Rev. Mr. Mills. The Rev. Mr. Smith was the next minister, and was called in 1834, and remained until 1837, when he died. After which, the Rev. Mr. Welden was called, but did not accept; and the Rev. Messrs. Harrison and Geisenhamer officiated concurrently until the Rev. Mr. Meyer was called in 1839. He was the incumbent at the time the testimony was taken.

In May, 1837, after the death of the Rev. Mr. Smith, there being great contention in the church, and the board of trustees being divided in opinion—five members adhering to the party of the complainants, and four of them, together with a majority of the congregation, taking part with the defendants—a resolution was adopted by the congregation reducing the number of the trustees to six, and removing from office three of those belonging to the complainants' party. The three thus attempted to be cut off continued to act as trustees, and in conjunction with the two others who adhered to the complainants, employed the Rev. Mr. Ebaugh to preach in the church for three months. He officiated one Sunday, but owing to the disturbance created by the opposite party, the five trustees shut up the church, and religious services were suspended until the order of the vice chancellor hereinbefore mentioned enabled the party adhering to the defendants to occupy the church. The complainants are a part of the five trustees who composed a majority of the board prior to May, 1837, and others chosen by the party who act with them in the controversy. The defendants claim to be trustees in consequence of elections held by the congregation to supply vacancies regularly occurring, they having abandoned the resolution reducing the number, as stated in the answer. Messrs. Welden, Harrison, Geisenhamer and Meyer, were called by the defendants after the division which took place in the board in May, 1837. The written calls of Messrs. Knouse, Smith and Meyer were

Miller *v.* Gable.

produced. They purported to have proceeded from the consistory, and to have been sanctioned by the board of trustees, and each of them contained an injunction to the minister to teach the Heidelbergh Catechism, and in the cases of Mr. Knouse and Mr. Smith, their ministrations were to be according to the order of the German Reformed Church. Mr. Knouse was a German Reformed minister, and was connected with the synod of that church in Pennsylvania; Messrs. Smith, Welden, Geisenhamer and Meyer, were Lutheran clergymen, and were connected with the ecclesiastical body called the Lutheran *ministerium* of the state of New-York, and Mr. Harrison was an independent. It did not appear that the church had been connected with the Lutheran organization, or that the Lutheran ministers had inculcated any doctrines or introduced any practices inconsistent with the Heidelberg Catechism, which continued to be taught, or variant from the forms of the German church.

A number of clergymen and other persons were examined respecting the characteristics of the Calvinistic and Arminian doctrines, and the tenets respectively held by the German Reformed, the Dutch Reformed and the Lutheran churches, the authority and jurisdiction of church judicatories, and the difficulties which led to the litigation in the church in question. By this testimony the complainants endeavored to show that the German and Dutch Reformed churches were strictly Calvinistic in doctrine, and that the Lutheran was Arminian, and that the difference between these modes of belief was fundamental; while the defendants attempted to establish a distinction between the Dutch Reformed and the German Reformed doctrines, and to prove that the tenets of the latter were not materially variant from those held by the Lutheran churches. Portions of this testimony are stated in the opinions of members of the court.

The cause was referred to the vice chancellor of the first circuit, and was brought to a hearing before the assistant vice chancellor, who, on the 19th December, 1842, made a decree dismissing the bill. The following opinion was delivered by

Miller *v.* Gable.

Hoffman, Assistant Vice Chancellor. The elaborate and able arguments on behalf of the complainants, which have been made upon the hearing and rehearing of this case, may be arranged under the following positions. 1. That the union of the church in question with the Reformed Dutch Church was indissoluble; that it involved permanent submission to the ecclesiastical jurisdiction of that church; and that the property could only be used by those who submitted to that jurisdiction, as well as held the same tenets. Of course, the success of this proposition would settle the case in favor of the complainants, the law and facts being then very plain. 2. That the union with the Dutch Church, after its resumption at a given date, has never been legally dissolved; that a majority of the trustees and congregation were in 1837 actually in favor of its continuance, and that the alleged rescision by the congregation was illegally obtained. 3. That the property is to be treated as dedicated by the founders to the support of the tenets of the Dutch Reformed Church; if not in express language, yet necessarily, inasmuch as the tenets of the Dutch Reformed and this German Reformed Church were the same; and as a branch of this proposition, it is contended that at least it must be treated as dedicated to the teaching of undoubted Calvinistic doctrines, which obligation the defendants have violated. 4. And lastly, that at least a portion of the property, being equal to the avails of the Nassau-street lots, must be decreed to belong to the complainants.

1. As to the first point, the case is this. An independent congregation, under the style of the " German Reformed Congregation of New-York," existed and worshipped in the city of New-York prior to the year 1763. It had its pastor, elders and deacons. When it was first established, and in whose name its property stood, does not appear in evidence. It had incurred debt, and had voted to a previous pastor the sum of £150 per annum, when such debt should be removed. In the year 1763, this congregation decided to ally itself with the Dutch Reformed Church then established in the city, and to be subject to its ecclesiastical jurisdiction. They thereupon, by a formal vote, united themselves with the Classis of Amsterdam, or Synod of

North Holland, to which the Dutch Reformed Church in this city was subject. In 1772, the Dutch Church in the United States separated, so far as absolute authority is concerned, from the ecclesiastical jurisdiction of Holland, and established a general system of church judicatories in this country. The church in question was represented at that assembly, and assented to its acts. It became attached to the Classis of New-York, and was represented in it from that time to the breaking out of the war.

I pause at this point—because the complainants' case in the aspect now considered, is vastly stronger than at any subsequent period. What would be the decision if the cause had arisen in 1782 upon these facts, or was now to be decided upon them? I think there is a plain distinction in sound reasoning, and supported by authority, between the dedication of property to support peculiar tenets, and its dedication to support such tenets in connection with and subjection to a particular church government. The union in 1763, and its continued connection under the new organization of 1772, could not of itself so bind the property to a connection with that government, as to render a rupture a forfeiture. The distinction which meets the argument of the complainants' counsel is this: A regular Dutch Church, originally formed as a branch of the main body, or in subordination to its church government, *as a Dutch Church,* cannot break off from that government and discipline without losing the very character of a Dutch church. A church avowedly *independent* in its origin, may form a union, the breach of which only restores it to its former position. But the decisive answer is this—property may be given to the support of tenets, without subjection to any ecclesiastical power which upholds these tenets. It must be shown, that it was given for promulgation of the one, in subordination to the other. Supposing in this case, that it was dedicated to the support of the identical tenets of the Dutch Church, it was not given to those only who should obey the Dutch Church's judicatories. Suppose property given to support a succession of pastors, belonging to the Reformed Dutch Church of North America—a pastor who disobeys or disclaims the ecclesiastical power of that church, is as clearly excluded

from the gift, as if he preached Arminianism or Unitarianism. Suppose property given to A. and B. and their successors, trustees for the Dutch Reformed Church situated in a particular place, or, as in *The Dutch Church* v. *Mott*, (7 *Paige*, 78,) to trustees for the common use of the ministers, elders and deacons of the Low Dutch Church in the city of New-York. If those claiming to share the fund do not submit to the government of the church as it then existed, or as changed by legal authority, their very identity, the character which alone gives them a right, is lost. But take a case, such as the provisions of the deed in the case referred to supplies, of a grant to trustees for the support of the ministers who shall have charge of a church in a given place, and shall hold the canons of the Synod of Dort. Even if that congregation was then a regular Dutch Church in full subjection, but not so designated in the deed, I apprehend that a separation would not avoid the gift for those who adhered to the tenets. But, unquestionably, if it had been an independent church, and had formed an union with the Dutch Church for its better government, an union in its nature dissoluble and repeatedly broken, not a doubt could exist. The property never has been given, so far as any dedication is shown, to trustees of a German Reformed Church, or for its use, in subjection to an ecclesiastical body. That subjection indeed existed, but not a word of express language, and nothing of just inference, indicates the intention of the givers, that it should be perpetually held in that subjection.

But how irresistible does this argument become, when we regard the acts of this church, and the passive submission almost amounting to assent, of the classis in 1784. The very property now in dispute was purchased, when the congregation had solemnly declared its alliance with the Dutch Reformed Church at an end; when the body which held and governed its temporalities was organized contrary to a material regulation of that church, making its officers as to spiritual and temporal matters nearly identical; and when the deed, under which this property is held, vests it in " Trustees of the corporation of the German Reformed Church in the city of New-York, and their successors

trustees as aforesaid." · It must be remembered that after the war an application was made for a resumption of the union. The classis did not pretend that this connection had subsisted during the war in right and law, though in fact interrupted, but they invited a restoration of the alliance, and the church deliberately refused, and avowed the intention to hold itself forever independent. This was followed by a marked and material deviation from a regulation of the Dutch church. By its constitution, the minister, elders and deacons in one board have charge of the temporalities. Accordingly, the appointment of trustees under the first act of our legislature respecting religious societies, was, it is stated, almost unknown, and esteemed irregular. Indeed it necessarily must have been so. And both in this state and New-Jersey, a special act was passed, out of respect to this regulation, constituting the minister, elders and deacons the trustees, and making them a corporation upon their filing a certificate of their name and title. (3 *R. S.* 207; 7 *Halst. Rep.* 206.) Now this church, at the very time of declaring its independence of the classis, proceeded to elect trustees under the general act, who have always since remained a body distinct from the consistory. I need but glance at the subsequent relations of the church as to ecclesiastical supervision. From 1784 to 1799, it remained disconnected and independent of the Dutch Church. From 1799 to 1805, the union was kept up. It was interrupted entirely or partially, until 1812. From that time to early in 1823, it subsisted. Then difficulties arose, and at the very period when part of the proceeds of the sale of the Nassau-street church were used in building the present church, this severance existed. In 1825 a committee of classis reported that an attempt to re-unite the church with that body would be unavailing. From that time until 1837, the connection was severed. Then the difficulties arose from which the present suit has sprung.

There are two cases which bear strongly upon the question now discussed, and one of them appears to me to be decisive. In *The Presbyterian Church* v. *Johnston*, (1 *Watts & Serg.* 1,) the terms of the grant were "in trust for and as a site for a

house of religious worship, and a burial place for the use of the religious society of English Presbyterians and their successors in and near the town of York," &c.    The congregation of York subsequently became incorporated.    The ecclesiastical connection of the congregation was with the Carlyle Presbytery up to about 1838.    After the breaking up of the Presbyterian church into two organized bodies, each claiming to be the general assembly, a resolution was adopted, declaring it inexpedient for the present to recognize the jurisdiction of any of the conflicting church judicatories.    A minority of the congregation thereupon withdrew, and elected the plaintiffs in the suit, trustees, who brought the action to recover the lands.    The majority remained in possession, and also elected trustees, who were the defendants. In the court below, Hays, president, delivered the opinion.    He says, "The only guide as to the rights of the members or the corporation, are the deed and the charter.    In the deed there is not one word pointing to the ecclesiastical connection of the persons for whose use the land was conveyed, with the Carlyle Presbytery or any other.    The congregation must enjoy the land granted in subordination to the uses described in the deed. The charter cannot change the effect of the grant.    The grant is a contract, the obligation of which cannot be impaired by any authority."    The court then examined the legality of the election of the defendants as trustees, and held that it was according to the charter and lawful, and that no others could regularly be trustees.    And it held distinctly, that the want of an ecclesiastical connection and superior church government, did not impair the rights of the trustees; there being no recognition in the deed of any special or particular church government.    I have stated the main points of the opinion of the court below. The affirmance in the supreme court was substantially on the same ground, viz. that no particular Presbyterian connection was prescribed by the founders.    Chief Justice Gibson observes, that subjection to a particular judicatory may be made a fundamental condition of a grant.    He refers to the case of *Duncan* v. *The Ninth Presbyterian Church,* in which a trust was declared "for such congregation of persons as shall belong to

the present Reformed Synod, to which the Rev. Robert Amand's church in Spruce-st. belongs." He says the case was settled; but he had differed from some of his brethren who thought the congregation had not lost the property in the trust, by putting off its distinctive character, and merging itself in the mass of the Presbyterian church. Even without an express condition, it might be a breach of a compact of association, for the majority of a congregation to go over to a sect of a different denomination; the majority of Seceders could not carry the church property into the Presbyterian connection, although these two sects have the same standards and plan of government.

The decision and able opinion of the court in *Den* v. *Bolton,* (7 *Halst. Rep.* 205,) support the distinction I have taken. The land in that case had been conveyed to the "Minister, Elders and Deacons of the Dutch Reformed Church in the English Neighborhood," then incorporated. In 1824 a body of the corporators withdrew from the Classis of Bergen and the General Synod, with which the church had been connected, and went into union with what was termed the *true* Reformed Dutch Church. The court showed that this secession was illegal, and the new judicatory unconstitutional. The trustees who sued, were chosen according to the established forms and regulations, and were the true and lawful representatives of the corporators. The defendants therefore could not be such. The chief justice in his opinion says: "Simply holding the same faith, without submitting to the government and discipline of a church, cannot make or keep a man a member of that church." Thus we see that the property was expressly given to those who legally answered the description in the deed, and they were at the time necessarily subject to a particular judicatory, and could not legally exist but in such subjection. The deed itself as plainly requires the particular ecclesiastical connection, as the support of the doctrines of the church.

It is said by one of the clerical witnesses, that a church has no more right to withdraw from ecclesiastical jurisdiction than a county from the authority of the state. But what is the consequence of a refusal to obey, or a withdrawal from the super-

vision of such a body? Can it ordinarily be any thing but ecclesiastical censure, suspension, excision, excommunication, or such other punishment as is constitutionally prescribed? The fourth chapter of the constitution of the Dutch Church has provided for such cases with judgment, caution and firmness. Forfeiture of property will also follow, if that property has been actually given so as to be dependent upon the union. I may here refer to the language of Chief Justice Tilghman, (2 *Serg. & Rawl* 543,) "Every church has a discipline of its own. It is necessary that it should be so, because without rules and discipline, no body composed of numerous individuals can be governed. But this discipline is confined to spiritual affairs. It operates on the mind and conscience without pretending to temporal authority." See also Justice Duncan's opinion (7 *Id.* p. 556.)

My opinion upon this first point is therefore clear. Whatever were the uses for which the property was given, it was not given to be held by those, or for the use of those, who should be in connection with, and subordination to, the ecclesiastical government of the Dutch Reformed Church. The existing union was wholly insufficient to bind the property to that use. That union was voluntarily assumed for spiritual support and guidance; most beneficial in its existence, and hurtful when abandoned; but it was suspended or renounced at different times, and for the larger part of the time, and was repeatedly treated by the classis itself as voluntary and dissoluble.

2. The next material ground taken is, that the act of dissolution or separation in 1837, was not legally passed by a body duly representing the church. It is to be remembered that an actual separation existed from 1825 to 1837, the ministers being called without the sanction of classis. Then an attempt was made by one body to have a formal dismission agreed to by classis. This was refused; and there were at that period, four trustees for, and five against it. It is insisted that the majority of the congregation were also opposed to the separation. Whether this was the case or not is immaterial. At the next election a majority of these five trustees were removed, and others elected

favorable to the dissolution. That settles the question as to the will of the congregation.

3. Perhaps the conclusions now arrived at are sufficient to dispose of this bill as it is framed. It proceeds upon the ground of subjection to the judicatory and discipline of the church, as well as adherence to its tenets. But it would be a narrow and technical view of the case, to confine it to this. And I think also, that under a bill like the present, the question of a deviation from the tenets of founders, may be entered upon. And in this inquiry I shall first seek to ascertain what principles of law have been settled to guide me in my judgment, and then apply them to the facts.

The equity tribunals of England have often passed upon these questions. Their doctrines may be substantially stated thus. They disclaim all power to canvass or determine the scriptural truth of any tenet, held by individuals or congregations. They have steadily adhered to the principle that they can only inquire into the tenets promulgated in a church, in connection with a right to property, or a trust to be administered. The limit of the inquiry is this: was there an appropriation of property for the support of a church in which certain religious doctrines should be taught, or a trust created for the promulgation of such doctrines? If these objects are not contrary to the law of the land, then the next inquiry is, has there been an attempt to withhold the property from the uses to which it was dedicated, or to apply it to others of a repugnant character; and hence, sometimes, whether those who participate in the avails of the property, adhere to the doctrines it was given to sustain. I shall advert to some of the leading cases upon this important subject. Lord Eldon, in *The Attorney General* v. *Pearson*, (3 *Meriv.* 409,) says: "It is clearly settled, that if a fund, real or personal, be given in such a way that the purpose be clearly expressed to be that of maintaining a society of Protestant Dissenters, promoting no doctrines contrary to law," "it is then the duty of this court to carry such a trust as that into execution, and to administer it according to the intent of the founders." Again, (*p.* 415,) "I agree with the defendants that the religious belief is irrelevant.

to the matters in dispute, except so far as the king's court is called upon to execute the trust." And again, (*p.* 400,) he says: " Where a congregation becomes dissentient among themselves, the nature of the original institution must alone be looked to as the guide for the decision of the court. And to refer to any other criterion, (as to the sense of the existing majority,) would be to make a new institution, which is altogether beyond the reach, and inconsistent with the duties of the court. If the deed bear a decided manifestation that the doctrines intended to be inculcated in this chapel were Trinitarian, and if any number of trustees are now seeking to fasten on the institution the promulgation of doctrines contrary to those which were intended by the founders, I apprehend that they are seeking to do that which they have no power to do, and which neither they, nor all the other members of the congregation can call upon a single remaining trustee to effectuate." The cases of *Cragdallie* v. *Aikman*, (1 *Dow's P. C.*, 1;) *Foley* v. *Wontner*, (2 *Jacob & Walk.* 245;) *Leslie* v. *Birnie*, (2 *Russel*, 114;) *Davis* v. *Jenkins*, (3 *Ves. & Bea*, 156;) and *Milligan* v. *Mitchell*, (3 *Mylne & Craig*, 72, *and* 1 *Mylne & Keen*, 446,) recognize the same principles. In the last case, the bill sought a decree that a certain lease and chapel were held in trust for religious worship, according to the institutions and observances of the Church of Scotland, and prayed certain directions to carry this declaration into effect. Lord Cottenham stated that the questions to be considered were, *first*, whether the property in question was held upon the trusts alleged in the bill; *secondly*, whether there had been a breach of such trust; and *thirdly*, whether the complainants were entitled to relief in the suit as instituted. The evidence satisfied him that the chapel was built, and the lease obtained for the purposes of worship according to the doctrine and discipline of the Scotch Presbyterian Church, and that it was held upon trust for that purpose. It appeared that a Mr. Scott had been called as pastor, and upon an application to moderate his call, he declined to sign the confession of faith of the church; and the Scotch Presbyters of London would not approve the call. Subsequently he was again elected by the congregation, in opposition to a

remonstrance of the Presbytery, and thereupon his license was withdrawn, and the sentence upon appeal was confirmed by the general assembly. They continued to employ him, and the Lord Chancellor held that this was a direct departure from the trusts of the lease. It may be observed, that it is a fundamental ordinance of the Scottish Church that no minister can be appointed as pastor of a congregation, unless he has been licensed to preach by the superior church judicatory. The congregation had, in 1803, adopted resolutions, one of which was "that no minister receive a call who had not been licensed to preach the gospel according to the established regulations of the Church of Scotland." Certain members passed a resolution in 1833, annulling these resolves. The Lord Chancellor held that the latter meeting was irregular. He adds, "If it were necessary *to come to any conclusion as to the extent of the power of altering the laws,* it might safely be assumed that such power did not extend to altering the fundamental principles upon which the association was framed, and destroying the trusts upon which the property was held." The case of *The Attorney General* v. *Pearson,* came again before the court in 1835, (7 *Simon's Rep.* 290,) and received a final decision. It is a very instructive case, and goes as far as any which can be found. The original deed was made in 1701, and it was declared that the meeting house was intended by the parties to the grant, and all who contributed towards the building of it, to be used "for the worship and service of Almighty God." The toleration act, (1 *Wm. & Mary, sess.* 1, *ch.* 18,) was then in force, protecting Protestant Dissenters, but excluding from the act those who denied the Trinity. The original founders and contributors were dissenters of the Presbyterian denomination. There was evidence to show that they were Trinitarians. In the course of time, a change of opinions took place, so that the trustees, ministers, and a majority of the congregation, had ceased to be Trinitarians. The vice chancellor held, that as it was a fact not denied, that the opinions of Presbyterians at the founding of the charity were in favor of the Trinity, it might be reasonably inferred that they never would have meant that the Unitarian doctrine should be taught in the

meeting house; and that, as it was illegal at that time to teach such doctrines, it might also be inferred that they did not mean such a trust as would include the promulgation of these illegal tenets.

The case of the *Attorney General* v. *Shore,* (termed *Lady Hewley's case,*) has, I observe, been lately affirmed in the house of lords, and deserves particular notice. It is reported in 7 *Simons,* 309, *n.* and is stated by Lord Sugden in the *Attorney General* v. *Drummond,* (1 *Connor & Lawson,* 210.) It was first decided by Sir Lancelot Shadwell, Vice Chancellor; affirmed by Lord Lyndhurst, Chancellor, assisted by Baron Alderson and Mr. Justice Patterson, and lately (1842) affirmed in the house of lords. It comes therefore armed with the whole judicial strength of England. The deed of foundation was dated in 1704. It gave property for the purpose of assisting poor and godly preachers of Christ's Holy Gospel; to assist in the education of young persons intended for the ministry of Christ's Holy Gospel, and other similar objects. It was admitted that the terms used did not embrace ministers of the established church. No doubt, the fact of the founder being a Presbyterian, and the other facts of the case, were the grounds of this. Then Lord Lyndhurst established that the tenets of the great body of Presbyterians at the period of the grant were Trinitarian; next, that Lady Hewley was shown to have been one of that denomination. That the burthen of showing that she held Unitarian opinions was therefore upon the other side; which not being done, she must be assumed to be a Trinitarian, and a believer in original sin— a Presbyterian doctrine—and one rejected by Unitarians. But again—the Lord Chancellor states the toleration act of 1688, and the statute of 1699, declaring a denial of the three persons in the Trinity to be God, was blasphemy, and visiting it with heavy penalties. "I am not justifying the law," he says. "I am making no comment upon it. I state what it was. I cannot bring myself to the conclusion, that Lady Hewley intended to promote the preaching of doctrines contrary to law—that she intended to violate the law." His lordship gives this as a summary of the law. "I agree entirely in the principles stated by the learned

judges, upon which this case must be decided. In every case of charity, whether the object be religious or purely civil, it is the duty of the court to give effect to the intention of the founder, provided that can be done without infringing any known rule of law. It is a principle uniformly acted upon in a court of equity. If the terms of the deed of foundation be clear and precise in the language, and clear and precise in the application, the course of the court is free from difficulty. If the terms used are obscure, doubtful, or equivocal, it becomes the duty of the court to ascertain by evidence, what was the intent of the founder. It is a question of evidence, and that evidence will vary with the circumstances of each particular case. It is a question of fact to be determined, and the moment the fact is ascertained, then the application of the principle is easy. These principles are founded in common sense and common justice." This case has also been commented upon, and explained by Lord Chancellor Sugden, (*Attorney General v. Drummond,* 1 *Connor & Lawson,* 210.) The point decided by Lord Sugden was very similar. The deed was for supporting the protestant dissenting interest, for the education of youth designed for the ministry among Protestant Dissenters, and for assisting protestant dissenting congregations. Five meeting houses had been built by the subscribers. The question was as to permitting Unitarians to share in the property. It is to be noticed that the Irish toleration act was not passed when the deeds were executed, so that all classes of dissenters were equally illegal. The case therefore is very important, as showing the evidence which the Lord Chancellor treated as admissible to ascertain the meaning of the founders, and who were the objects of their bounty, or rather if Unitarians must not be supposed to be excluded. He, in the first place, holds that parol evidence of declarations of intentions was not admissible, if the parties to the deed had declared the meaning they attached to the phrase " Protestant Dissenters." No declarations could be admitted against the deed; and if they agreed with it, they were not necessary. He then adverts to the arguments of the attorney general, in Lady Hewley's case—that he did not complain of

Miller *v.* Gable.

evidence showing the meaning attached to particular words at a particular time—nor to usage to show in what sense the words were used, when the deed was executed.   But he did object that the court below had acted upon evidence given with a view to show in what sense Lady Hewley used particular words.   He adds, " The objection then was not to the general admissibility of evidence, but to such as went to construe the deed by expressions of opinion by Lady Hewley.   And I will not act on evidence of that kind in this case."   " What I am prepared to do in such cases is this—I shall admit, or if not tendered, see myself, in the writings of the period, in historical records, acts of parliament, and writings of persons of the different persuasions at the date of the deed, for all helps to tell me what was the meaning of the words used; not to do violence to the deed, but to put such an interpretation upon it as shall be consistent, as well with what appears on the face of the instrument as with the intention of the founder.   I reject all evidence of what the founders thought, but I receive evidence of what their acts were, their circumstances, the places of worship they resorted to." Thus clear and decisive are the doctrines of the English law upon this subject.   It is to be seen whether they have been denied or shaken in our own country.

In the case of *St. Mary's Church,* (7 *Serg. & Rawle,* 539,) the learned chief justice thus speaks of the great question now before me.   " If such measures should be taken with regard to the employment of pastors, as are incompatible with the fundamental principles of the Roman Catholic Church, it may be a serious question what will become of the real property of the congregation.   From what appears, the ground on which the chapel stands is held in trust for a Roman Catholic congregation.   The charter was granted to a religious society of Roman Catholics, and before the charter the ground and chapel was held in trust for a religious society of Roman Catholics.   Now if a majority of this congregation should insist upon employing pastors contrary to the rules of the church, and the minority should choose to remain strict Roman Catholics, in the sense of the word at the time of their incorporation, what is to become

of the chapel and the ground ? That is a momentous question on which I have not formed an opinion." In *Field* v. *Field,* (9 *Wendell,* 401,) Justice Nelson distinctly recognizes the rule of the English court, and cites and approves of the case of *The Attorney General* v. *Pearson.* After observing that a diversion of the fund from its original purposes was a subject of equity jurisdiction, and could not be corrected at law, he says : " If the object of the original contributors of this fund was the instruction and education of their children in the faith and doctrine of the Society of Friends, as understood and believed at the time it was placed under the direction of one of their associations, it is quite clear, both on principle and authority, that such object should be strictly observed by those who have the management of it, and that an ample remedy exists against any perversion of the fund. The question is not which faith is the soundest or most orthodox, but for what purpose or object was the fund originally established by the founders of it. The court proceeds to enforce the observance of an ascertained trust, in which rights of property are concerned, not the peculiar doctrines of either party, though their existence and nature may be incidentally involved."

In the *Baptist Church* v. *Witherell,* (3 *Paige,* 296,) there are, however, expressions of the chancellor casting much doubt upon the point. After citing the *Attorney General* v. *Pearson,* he says : " I confess I have always entertained serious doubts whether any civil tribunal in the state could interfere to prevent the majority of the corporators in a religious society from introducing such changes in the doctrines or modes of worship in their churches as they might deem expedient. Neither am I prepared to say that it would be right and expedient to adopt the principle of Lord Eldon here, where all religions are not only tolerated, but are entitled to equal protection by the principles of the constitution. Upon Lord Eldon's principle, a society of infidels, who had erected a temple to the Goddess of Reason, could not, upon the conversion of nine-tenths of the society to Christianity, be permitted to hear the word of life in that place where infidelity and error had once been taught." But, with

great respect, such a case as the worship of the Goddess of Reason in a temple reared to her could not occur in England. While Christianity is recognized as part of the law of the land, there could be no legal dedication or preservation of property for such a purpose. It would be broken up on an information of the attorney general. It could be destroyed by creditors, or assignees of the donors. I am strongly inclined to think that the donors themselves could overthrow it. Speaking with humility on so momentous a question, I hold that no title will ever be allowed to stand in the tribunals of this state, founded upon avowed infidelity; no right to property can be created or employed to assail and subvert the Christian faith. And it must be considered that if such a temple to falsehood as the chancellor imagines, can be guarded and perpetuated by the law, equally may any Christian church built on property given expressly for the spread of the gospel, be converted, at the will of the majority, into a hall for teachers of apostacy, blasphemy, or atheism. The argument is as strong in the one aspect of the case as in the other. If you cannot divert property from an infamous dedication, neither can you prevent its perversion from the uses of piety to those of infamy. I should be loath to say, in the present tendency to evil, on which side the greater danger lies; loath to estimate the chances, whether the golden candlestick would remain upon the altar where it now shines gloriously, or be planted on the places now reared to impiety. But this I know, that no man in the land would more detest the consequences of casting religious truth and the rights of property at the feet of the majority of the hour, than the eminent judge whose language has given the doctrine a momentary countenance. Again, I apprehend that in the subsequent cases of *The Dutch Church* v. *Mott*, (7 *Paige*, 78,) and *Lawyer* v. *Cipperly*, (*id.* 282,) the chancellor has gone some length towards the adoption of the English rule. (*See also Chambers* v. *The Baptist Education Society*, 1 *Monroe's Law and Eq. Rep.* 215.)

I come to the conclusion, that the great principles of the English equity courts are in force in this state, and must be my guides.

Miller *v.* Gable.

The case then stands thus: The defendants have possession; have been legally elected trustees of the church by which the property was purchased. They have every legal muniment. I am called upon as a judge in equity, to overthrow that legal title. I discard the factious doctrine that the majority for the time being is to govern. I hold that I am bound to interfere upon the complant of a single worshipper in the church, against a thousand others, *Provided—First*, that it is certain the property was dedicated to definite legal purposes; *Second*, that it is certain the possessors of the property are violating those purposes.

The first proposition is, that the will of the majority of the holders of the property is not to be regarded. It is needless to dwell upon this. It must be the law until courts of justice say, that if a man devises his property to one of several heirs, the majority may destroy his gift, and take it from him.

Then the next proposition is, that the property must be dedicated to definite purposes, and those must be legal purposes. We cannot say whether they are legal or not until we find what they are. Then the first inquiry is, are the purposes definitely pointed out? Property in England might be dedicated with the utmost precision, to the support of the dogmas of the Church of Rome. The law of England has declared this appropriation of property utterly illegal. A dozen statutes have been passed to declare and enforce this illegality. Property in the United States may be given to the support of Romish doctrines, and no law interferes with the appropriation. The inquiry then is merely, has it been so appropriated? So property may be dedicated to the support of the tenets of every sect down to the last shadowy point at which Christianity is lost in morality, or where rationalism destroys faith. Still the law in this land cannot speak—cannot interpose. It must be submissive, until blasphemy, open and avowed blasphemy against Christianity, is to be supported through the agency of a court of justice; and then I hold that no deed, however solemn, can avail—no multitude, however great, can sanction the consignment of property to this deadly use.

In inquiring what were the tenets of the congregation in 1765, it might be sufficient to limit the investigation to this: What were the doctrines of the Reformed German Church, in 1784 ? Are they identical, or so closely allied with those of the Dutch Church as expounded at Dort, as to settle explicitly what are the tenets to be observed, and to leave only the question of deviation open? Beyond a doubt, we have in the canons of the synod very explicit standards of faith—in the constitution very definite forms of government and discipline. But the case has been chiefly argued and considered with reference to the tenets held in 1765, at the erection of the church in Nassau-street; and certainly it may be forcibly argued that if the doctrines were then distinctly marked, the presumption at least will be that they remain unchanged. All the light which can be thrown upon this subject arises from the character of the church before its union with the Classis of North Holland; the declaration accompanying the foundation of the church in Nassau-street; and the effect of the alliance with the Dutch Church in 1763, and continued under the independent organization effected in 1773. The character and style of the body before the union was the "German Reformed Congregation of New-York." At the laying of the foundation stone, each person declared it was to be a German Reformed Church. The pastor declared that the word of God should there be preached according to the reformed doctrine of Heidelberg and Switzerland.

*First,* then, what were the prevailing scriptural tenets of Switzerland, or rather of the Reformed Churches of Switzerland, at that period? We have the testimony of one of the reverend witnesses that the doctrine of the Reformed German Church is Zuinglianism. It is certain that the foundation of the reformation in Switzerland was laid by Zuingle, and that the peculiar character of his tenets and principles have been deeply impressed upon the churches of that land. The reformation in Switzerland began in 1519. It is perfectly true, that the churches which embraced the tenets of Calvin, and the Swiss Churches, are treated of by Mosheim under the general title of the Reformed Churches; but this was in contradistinction to the Lutheran

Churches. The Refomed Church, in the acceptation of the history of that period, does not mean the churches strictly Calvinistic, but those which differed from Luther on the dogma of *consubstantiation;* though great and substantial differences existed between themselves. The late translator of Mosheim, Dr. Murdock, justly observes, that the differences among the Reformed Churches, both as to doctrine and discipline, were very great. Upon some of the leading doctrines of the Christian faith, there were marked differences between the principles of Zuingle, and those of Calvin, and the Synod of Dort. As to the sacrament of the Lord's Supper, the former expressly taught that the elements were no more than external signs and symbols. *Nil esse in cœna quam memoriam Christi.* (3 *Mosheim,* 274, *n.*) See also the passage cited by D'Aubigne, (*History of the Reformation, vol.* 3, 316, *and n.*) "*Haud aliter hic panem et vinum esse puto, quam aqua est in baptismo.*" "This opinion," says Mosheim, "was embraced by all the friends of the Reformation in Switzerland, and by a considerable number of its votaries in Germany." The subsequent attempts of Bucer to reconcile Luther and Zuingle upon this point, failed. Indeed it is stated, that the explanations which he gave, in his zeal to procure a conformity, awakened the suspicions of the Switzers that he had departed from their opinion; and neither Zuingle nor Oecolampadius were satisfied with him. (14 *Du Pin. Ec. Hist.,* 122, 134.)

With respect to the doctrine of Calvin, it is a matter of ecclesiastical history, that in his efforts to produce a union with the Lutherans, he used language so similar to that of Luther, as to make a difference scarcely distinguishable. He became subject to the remark of Bossuet, that his tenets did not vary much from the dogma of the popish real presence. At a later period, when he obtained such influence in Switzerland, and especially in his controversy with Westphall, he approached, perhaps adopted, the barren doctrine of Zuingle. Taking however his tenets to be fairly expressed in the Institutes, it would be difficult to point out a substantial difference between them, and the doctrine of the 28th article of the Church of England. See especially *Calvin's Institutes,* (*ch.* 17, *art.* 18.) "He com

mandeth us to take [the Savior's body.] I doubt not he doth indeed reach it, and I do receive it. It is a higher mystery than can be uttered in words."

But the language of the Synod of Dort upon this topic is as explicit and decided as could be employed. The thirty-fifth article of the Confession of Faith, is much stronger than the language of the institutes. Consider this passage of that article of the Confession of Faith: "In the meantime we err not when we say that what is eaten and drunk by us, is the proper and natural body and the proper blood of Christ. But the manner of our partaking of the same is not by the mouth, but by the spirit through faith." It is impossible that a conscientious man, who had engaged to teach the doctrine of that article, could teach the tenet of a figurative commemoration—the tenet of Zuingle. If, then, Calvin's opinions are to be judged of by what he has stated in the Institutes, they are wholly at variance with the sentiments of Zuingle. But if the opinions last promulgated by him are to be taken as his settled doctrines, then his views upon this great dogma of Christianity are wholly at variance with the canons of the Synod of Dort. And thus plainly a great and fundamental difference is made out between the faith of the Dutch Church and that of Switzerland. And thus also, a difference is made out between the faith of the German Reformed Church and that of the Dutch Church, so far as the reference to the faith of Switzerland throws light upon the faith of the German Church. Thus, then, when I am referred for an explication of the faith of the founders of this church to the faith of Switzerland, I find a fundamental variance from that of the Dutch Church.

Again, it is stated by one of the witnesses, that whatever Zuingle was, he was no Calvinist. To a great extent, this appears supported by reference to his works, and the expositions of his followers. Mosheim states, (*vol. 3, p. 278,*) that the absolute decree of God with respect to the everlasting condition of the human race, an essential doctrine of the creed of Calvin, made no part of the theology of Zuingle. I have been furnished, however, with a translation of a German work printed at Chambersburgh, in 1837, in which extracts are made from the works

of Zuingle, supporting the doctrine of election. A careful reference to his works will prove that still very important differences existed. Zuingle held, undoubtedly, that every thing took place according to the predetermination of God. But he explicitly held that unbaptized infants were saved; that the heathen were as much within the efficacy of the atonement as others; and that the death of Christ was an expiation of the sins of the whole world, not confined to the elect to whom Christ is made known. In short, the doctrine of reprobation in its high sense was no part of his creed. That tenet is thus stated by Calvin: "Neque enim, prœvideri ruinam impiorum a Domino Paulus tradit, sed ejus consilio et voluntate ordinari, quemadmodum ut Solomo docet, non modo prœcognitum fuisse impiorum interitum, sed impios ipsos fuisse destinato creatos, ut perirent." (*In Rom. cap.* 9, *verse* 19.) As to infants, the language of Beza, one of the most celebrated followers of Calvin, is this: "Idem in baptismo fit, quem multa millia infantum accipiunt, qui tamen nunquam regenerantur, sed in æternum pereunt." (1613. *Acta Colloquii Montisbell.*—*Quoted Lawrence's Bampton Lectures, p.* 443.) Dr. Lawrence thus states Calvin's doctrine; that though all children are outwardly incorporated into Christ's Church, some only are inwardly regenerated by the Spirit. (*Bampton Lectures. See Institutes, cap.* 16, § 17.) A few passages will show the views of Zuingle, and Bullinger his successor, on this head: "Ista in hunc usum argumentati sumus, ut ostenderemus toto errare cælo, qui damnationi æternæ solent adjudicare Christianorum infantes cum non sint baptismo tincti. Hoc enim, 'qui non crediderit, condemnabitur,' nullatenus est absolute intelligendum, sed de his qui audito evangelio, credere noluerunt. Unde infantes, et qui non audierunt evangelium, hac lege non tenentur." (*Opera vol.* 2, *p.* 118, *ed.* 1581. *Apud Bampton Lectures, p.* 286.) In another place, after discussing expressly the question of the safety of the infants of the Gentiles, he says: "Quanquam autem, ut ingenue fatear, mihi magis arridet ea sententia, quæ virtute mortis Christi omnium innocentium salutem acceptam fert. Si quæres quomodo possunt hæc fieri? Hoc modo. Quicquid uspiam mortalium nascitur salvum est per

Christum." Bullinger adopted the same doctrine. (*See a pas- sage Lawrence's Bampton Lectures, p.* 288.) Above a. l, Zu- ingle explicitly held, that there were elect among the heathen, who never heard, or should hear of the gospel. I refer to the passages in his works, *vol.* 2, *p.* 118, 371, 559. His fol- lower, Bullinger, expresses himself thus: "Certum est Deum et inter Gentiles habuisse suos electos. Si qua tales fuerunt, non caruerunt Spiritu sancto et fide. Idcirco opera ipsorum facta ex fide bona fuerunt, non peccata." (*Sermonum Decades, quinque, p.* 174.) It appears indeed that the ability and exertions of Cal- vin, produced an union between the Swiss churches and that of Geneva, in relation to their fundamental tenets. This agreement was made in 1549—1554. But in a note of the editor, (*p.* 279,) it is said that the patrons and defenders of Zuingle are exten- sively numerous, and his doctrine is revived in England, Swit- zerland, and other countries, and acquires new credit from day to day.

Again, in the year 1675, the *formula consensus* was adopted at Zurich. Commotions ensued, and in 1686, through the in- fluence of William of Brandenburgh, the canton of Berne, and the republic of Geneva, in effect abrogated. it. (*Mosheim, Book* 5, *Cent.* 17, § 2, *part* 2.) In our day, says Mosheim, it has lost nearly all its influence. Dr. Murdock says, in a note, that the *consensus* retained its authority at Geneva until 1706, when it fell into disuse. It continued in some of the cantons, and was considered by the kings of England and Prussia in 1723, as an obstacle to their projected union of the Reformed and Lu- theran Churches. Now this *consensus* condemned the doctrine of general grace, and established that of a special grace. And Mosheim writing, about 1756, says that the city of Geneva, the parent and nurse of the doctrine of absolute predestination and particular grace, had become itself so far Arminian, as to deserve a place among the churches of that communion.

With respect to the Heidelberg Catechism, it is admitted that it is susceptible of a construction at variance with the tenets of the Synod of Dort. The answer to the 37th question is capable of an Arminian interpretation. If we look back to the discus-

sions which took place at that assembly, and the documents presented by the remonstrants, we shall be convinced of the fact, and see the extent of this variance. From Brandt's History of the Reformation, (*vol.* 3, *p.* 83,) it appears that a paper containing their sentiments upon the first article was read on the 13th day of December, 1618. The fifth position of that document is this: "God hath decreed that Christ shall be an atonement for the sins of the whole world, and by virtue of that decree he hath resolved to justify, and save those who believe in him. *But he hath not absolutely decreed to give Christ for a mediator to the elect alone."* Again, in the sixth proposition it is said, "none are excluded from eternal life, nor from sufficient means of it, by any absolute decree which God hath passed beforehand, without respect to their unbelief or disobedience." That this is Arminian doctrine will be clearly seen from the passages quoted by Mosheim, (*vol.* 4, *p.* 130.) Now compare this with the language of the catechism in the answer to the 37th question, as well as the reply to the 20th, and the 23d. It is certain that under those summaries of doctrine, a person might faithfully teach, in consonance with the catechism, the dogmas of the remonstrants.

Widely different from this is the exposition authoritatively pronounced by the synod. The 7th article is express upon a special irrespective election. Thus then on this deep theme—free will, fore knowledge—that inaccessible problem which the human intellect has toiled for ages to surmount, and has fallen back from defeated and abashed, the catechism gave great liberty. It was so felt by the eminent divines of the synod, and they restricted that freedom. There is one fact however of consequence, to be here considered. The Swiss churches and those of the Palatinate were represented at the Synod of Dort, and approved of the confessions of faith and canons as well as the catechism. (*Brandt,* 3, 280, 289.) But it is to be observed that the canons and confessions were adopted and enforced by the States general, as binding upon all the ministers of the United Netherlands; so that the placard against the remonstrants issued on the 15th of July, 1619, prohibited the inhabitants from meet-

ing together to promote any doctrine, differing from the canons or decrees of the synod, upon pain of forfeiture of all benefices, or offices, and payment of a fine. The obtruding of any other doctrines as to the *five points*, was pronounced to be a defiance of all order and government, and to the destruction of the established religion. (*See Brandt, vol.* 3, *p.* 399, 400.) How actively this was followed up by the ejection of pastors, who refused to subscribe the canons, the history of Brandt exhibits. But I do not find in Switzerland or the Palatinate, any similar act on the part of the magistracy; and we must remember that the connection and submission of the church to the civil power, was as much a tenet of Zuingle as it was of Henry the 8th. We do find that the decrees were not submitted to by all the German churches. "Those of Brandenburgh and Bremen, would never suffer their doctors to be tied down to the opinions and tenets of the Dutch divines." (*Mosheim, vol.* 4, *p.* 80.) A learned divine of the Dutch church, informs me that Scultle and other deputies to the synod from Heidelberg were strongly opposed to Arminianism, and that Parens, an associate of Ursinus, delivered an eulogy of the synod about the time of its close. The observation may naturally be made, that the more clearly it is shown, that the authors of the catechism held the highest Calvinistic doctrines, the more striking becomes the fact, that the catechism itself is so worded as to admit an Arminian construction. We are to remember that it was compiled under the auspices of the elector, and for the churches of the palatinate.

But it has been strongly urged, that as the catechism is susceptible of two meanings, that should be adopted as the faith of the founders which consists with the canons of the synod, because at that time there was an union with the classis of the church of Holland. Beyond a doubt, as a piece of evidence, this circumstance has weight. It is obvious, however, that it does not conclude the question; because the submission to the Dutch church in matter of government did not necessarily involve the adoption of its doctrines as expounded by the synod. And some facts may be referred to tending to the opposite con-

clusion.   The Rev. Mr. Foering came from Manheim, in Baden, in 1763.   His call was only to preach the Heidelberg Catechism. It is to be remembered that every minister of the Netherlands was compelled to sign the canons.   If the great body of this congregation had adopted that exposition, it is presumable that they would have expressed it in the call.   This argument receives additional strength from the language of the calls made after the union with the Dutch Church.   Every one of them is only to teach the catechism, without any reference to the canons.   We find also, that the authorities in Holland pressed upon the Pennsylvania churches the necessity of sending their ministers to Holland to be examined, as the purity of doctrine in America had been in some cases impaired.   It was not until 1775, that the pastor of the church, (Rev. Mr. Gebhard,) signed the formula of the Dutch Church, adopting the exposition of the synod.   His call did not prescribe it.   It is to be observed, indeed, that it was only in 1773 that this formula was adopted as it now stands.   But the canons, beyond a doubt, had been subscribed by every regular minister of the Dutch Church in America.   And the subscription of Mr. Gebhard certainly establishes his faith.

Looking then to the true question, viz : is it made out that the founders of this church in 1765, had adopted the exposition of the Catechism given by the Synod of Dort, it is impossible to answer in the affirmative.   The presumption is rather the other way.   Whether the majority of its pastors so expounded it is not the question, though if proven, it would have been a piece of evidence.   I find the catechism now taught.   I find it susceptible of an Arminian construction.   If it now receives such construction, I am not able to say that the will and intent of the founders is thereby violated.   Then limit the inquiry to this: what are the doctrines of the German Reformed Church ?   It has been deposed to that the doctrines and practices of the German Reformed Church, or Zuinglianism, and those of the Lutheran Church, are not wide apart.   Reference is made by the witness to the union of the churches effected under the influence of the king of Prussia.   It is in evidence, also, that in

numerous instances members of the Lutheran Synods were ad-mitted to a seat, and to vote in the Synods of the German Reformed Church: and so interchangeably. And the Rev. Mr. Strobel, a witness for the defendants, states that he knows of no difficulty on the part of the Lutherans to prevent an entire union; that these bodies as a whole, have not yet obtained a sufficiently organized form to promulgate their sentiments to the world in an official manner; that there is a warm desire to effect an union here, as has been done in Europe. On the other side, several eminent and learned divines have stated that they understand the tenets of the Dutch Reformed and German Reformed Church of this country to be substantially the same.

It appears from a publication of the German Church, published at Chambersburgh, in 1841, that the churches in Pennsylvania were under the supervision, to a considerable extent, of the Synods of North and South Holland. The acts of the *coetus* appear to have been submitted to them. The Synods press repeatedly that all ministers should first appear before them to be examined. Writing in January, 1785, they urge this as all important, observing that sad experience proves that the doctrines of the Reformed Church are but too much departed from in many parts of Germany, and that they had heard that by certain teachers pushing themselves into several churches in New-York, the purity of the doctrine is in danger of being corrupted. In an address to the congregation in connection with the Classis of Philadelphia, it is stated, that in the year 1792 the separation of the *coetus* from the Synods of Holland took place, and the faith of the church is thus stated:—"The doctrines of the German Reformed Church are altogether evangelical: essentially the same as they were at the time of the reformation. Her doctrines are received from the Bible as the fountain, and are conveniently embraced in the Heidelberg Catechism. The Heidelberg Catechism, as the symbolical book of the German Reformed Church, was composed in the year 1562," &c. That Zuingle and Calvin were its founders. Again they say—"The government and discipline of the church may be learned from the constitution, liturgy, and the catechism."

Miller *v.* Gable.

Here, then, is the only standard to which the doctrine of the church is referred—by which the adherence of a pastor and congregation is to be judged. And I find all the pastors whose admission is considered an intrusion, teaching that catechism. If they teach it with an Arminian construction I cannot interpose. It is not established that the property was to be held for those otherwise interpreting it. The fact that the pastors have received instruction in Lutheran seminaries, or have probably imbibed Lutheran opinions on some points, is not enough. I say not what would be the case if the Heidelberg Catechism was abandoned, and a Lutheran Catechism substituted; and if a regular connection was made with the *ministerium.* That would be a widely different case.

The consideration of the *fourth* point is rendered unnecessary by my views upon the others.

After an anxious consideration of the cause, I cannot satisfy myself that the present trustees are so breaking through the tenets prescribed by the founders in 1765, or involved in the trusts of the deed of 1784, as to warrant this court in depriving them of the property, held with the sanction of the congregation. But I feel called upon, and I trust without departing from my duty, to earnestly and warmly press upon these litigants a compromise. The propositions heretofore made strike me as equitable and fair; promising a termination to this sore controversy—the end of angry, profitless strife—and the source of Christian peace and spiritual blessing. The bill must be dismissed.

The complainants appealed to the chancellor, who in May, 1844, made a decree reversing the order of the assistant vice chancellor, and declaring the complainants and their successors the legal trustees of the corporation in question and entitled to the temporalities; which the order declared were held in trust for the support of the worship of God by a church and ministry in connection with the church judicatories of the Dutch Reformed Church, and for the teaching of the doctrines of that church as recognized in its standards. The decree contained

proper directions to carry out its objects, and charged the defendants with costs. For a report of the case in the court of chancery and the opinion of the chancellor, see 10 *Paige*, 627. From this decree the defendants appealed to this court. The cause was argued here by

*W. B. Lawrence & H. M. Western,* for the appellants, who maintained the following propositions:

1. The trustees of the corporation of the German Reformed Church, with the concurrence of a majority of the congregation, had a right to make or authorize such deviations from the original doctrines, usages and government of the church as the founders could themselves have made. (*Case of St. Mary's Church,* 6 *Serg. & R.* 505 ; 7 *id.* 538; *Dartmouth College* v *Woodward,* 4 *Wheat.* 641; *Baptist Church in Hartford* v *Witherell,* 3 *Paige,* 296.)

2. Where a religious society is organized with reference to the doctrines of a particular denomination of Christians in Europe or in this country, such society may rightfully conform to any changes in doctrine or practice which have been adopted by the denomination at large.

3. The trustees of a religious corporation in this country have the sole charge and management of the temporalities, and the courts cannot interfere with their acts on account of any departure from the faith of the founders. (*Baptist Church* v. *Witherell, supra ; Lawyer* v. *Cipperly,* 7 *Paige,* 281; 3 *R. S.* 207, 208, §§ 3, 4; *Const. U. S. Amendment, art.* 1; *Const. N. Y.* 1777, *art.* 38; *Const. N. Y.* 1821, *art.* 7, § 3; 1 *R. S.* 92, § 1.) (1) The British cases relied upon for a contrary rule are based either upon the statute of charitable uses, (43 *Eliz. ch.* 4,) which is not in force here, or upon the visitorial power of the chancellor, which, as to religious corporations, has no existence in this state ; and these cases were moreover decided with reference to the act of toleration, (1 *W. & M. sess.* 1, *ch.* 18,) which placed certain dissenting denominations upon a similar footing in this respect as the established church, and are for that reason inapplicable here. And the deviations which were held to work a

forfeiture were upon fundamental points, and not upon meta-physical distinctions. (*Attorney General* v. *Pearson*, 7 *Sim. R.* 290; 3 *Mer.* 409; *Same* v. *Shore*, 7 *Sim. R.* 309, *n.*; *Same* v. *Drummond*, 1 *Conn. & Law.* 210; *Shore* v. *Wilson*, 9 *Clark & Fin.* 396; 2 *Story's Eq.* 541, *n.*; *Cragdallie* v. *Aikman*, 1 *Dow. P. C.* 1; *Foley* v. *Wontner*, 2 *Jac. & Walk.* 245; *Leslie* v. *Birnie*, 2 *Russ.* 114; *Davis* v. *Jenkins*, 3 *Ves. & B.* 155; *Milligan* v. *Mitchell*, 1 *Myl. & Craig*, 511, *and* 1 *Myl. & Keen*, 446, *S. C.*; 2 *Story's Eq.* 541; *Dutch Church* v. *Mott*, 7 *Paige*, 78; 2 *R. S.* 466, § 57; *Auburn Academy* v. *Strong*, 1 *Hopk.* 278.) (2) The American cases, though they have some-times disregarded the distinctions arising out of the English system, have generally awarded the temporalities to a majority of those interested in the trust; (*Commonwealth* v. *Green*, 4 *Whart.* 531; *Presb. Cong.* v. *Johnston*, 1 *Watts & Serg.* 1; *Hendrickson* v. *Decow*, *Saxton's R.* 582; *Field* v. *Field*, 9 *Wend.* 394; *Lawyer* v. *Cipperley*, *supra*; *Chambers* v. *Baptist Ed. Soc.* 1 *B. Monroe's Rep.* 215;) or (3) the case has turn-ed upon a statutory provision recognizing the authority of a superior church judicatory. (*Den* v. *Bolton*, 7 *Halst.* 237.)

4. " The German Reformed Church in the city of New-York," whose temporalities are in controversy, was never a Reformed *Dutch* Church, and never constituted an integral part of that church. (1) The connection between them was of a temporary character, involving no pecuniary consideration, and was often and at long intervals interrupted. It was never sanctioned by the corporate authority of the German Church, but consisted simply in an association for spiritual purposes, and was definitely discon-tinued many years since. (2) The church was never incorpo-rated under the provision for incorporating the Dutch churches. (3) It has always chosen its own ministers, and has never accepted a " supply" from the Dutch classis.

5. There has been no deviation from the doctrines which pre-vailed at the foundation, or at the time of the incorporation of the church; or if there has, it has been acquiesced in for such a length of time as to constitute a bar.

6. The appellants are the legal trustees of the corporation, and are in possession.

7. The respondents, if their pretensions are well founded have an adequate remedy at law.

8. The corporation should have been made a party.

9. The decree in the former suit is a bar.

*G. Wood*, for the respondents, insisted on the following points

1. The appellants and their associates and adherents aban-doned the established religious *faith and doctrines* of this reli gious society. (1) This religious society was and always had been Calvinistic in faith and doctrine, and adopted the faith and tenets of the Heidelberg Catechism, as held and interpreted by Calvinists. (2) The German Reformed Church, and the Dutch Reformed Church, held substantially the same religious faith and doctrine, which became the rule of faith for this religious society from its earliest infancy, and continued so till the appel-lants and their associates undertook to overturn it, to introduce Arminian doctrines, and to interpret the Heidelberg Catechism according to Arminian views, and seceded from the faith and doctrines of the society.

2. The respondents and their associates and adherents have and still do hold and maintain the religious faith and doctrines of the founders of this religious society.

3. The appellants and their associates have seceded from the *rule and government* to which this religious society was sub-jected. (1) Although this society continued for a short time in a state of independence, as every voluntary institution of the kind must at first, yet from their religious tenets and principles they were bound to come under subordination to a regular church government. (2) This society came under subordina-tion to the classis of the Dutch Reformed Church, and until then their government and discipline were inchoate and incom-plete; and such must have been the case, according to the reli-gious tenets and principles of the members. (3) At the forma-tion of this society, the greater part of the individuals comprising it, had, before said subordination, attached themselves to the

Dutch Reformed Church, and all of them were identified therewith substantially as well in doctrine as in discipline. (4) After the American revolution, this society came under subordination to the newly formed judicatories of the Dutch Reformed Church in America. (5) The appellants and their associates were seceders, by departing from the rule and government of the Dutch Reformed Church.

4. The appellants and their associates were not, at the time of their secession, a majority in this religious society; and if they had been, it would not have authorized them to secede, either from the standard faith or doctrines, and from the government and discipline of the church.

5. This controversy is between two sets of trustees, each claiming to be the legitimate trustees, and denying the rights of the other set. The respondents must prevail, because, (1) They adhere to the faith and doctrines of the society. (2) They adhere to the government and discipline of the church. (3) Their organization is regular and perfect. (4) The appellants are defective in all these particulars. (5) All the property of the church, wherever acquired, must follow, and be under the control of the legitimate church judicatories having charge of the same.

6. Although a court of law would have cognizance of this case, and entertain an ejectment, yet equity has concurrent and collateral jurisdiction, because, (1) The settlement of the right to the property involves the investigation of important public and pious uses. (2) The relief in equity is much more broad, comprehensive and complete. (3) The appellants have not interposed the objection, but have submitted to the jurisdiction of the court.

7. The claim of the appellants is not barred by lapse of time, because, (1) Twenty years would be the bar, in analogy to the limitation at common law. (2) The respondents have not, by plea, or in their answer, set up lapse of time as a bar.

GARDINER, President. The questions in this case are, *first*, as to the existence and character of the trust, and *secondly*, whether it has been violated.

1. Where the trust is declared in writing, and its nature and extent clearly defined, the court has no alternative but to carry it into execution. In gifts for charitable purposes, the donor may prescribe his own terms, and, if he declares the object of his gift to be to promulgate a particular creed or class of doctrines, or to secure a real or imaginary stability, by having those doctrines taught by a clergyman, and by a church in connection with, or in subordination to a particular ecclesiastical judicatory, his will, as in the case of a devise, stands for a reason and must be respected. But there is a class of cases, and this is one of them, where the founder of the charity in declaring the trust uses language, which, in its application to the subject of the trust, might be used in different senses by different individuals, and by the same individual under different circumstances. Parol evidence is not admissible for the purpose of contradicting or varying the terms of the conveyance; for that would, in effect, be creating a trust in reference to real property by parol. The court are to construe the deed, and the only legitimate office of extrinsic evidence, is to place the court as near as possible in the situation of the contributors to the charity for the purpose of enabling it to determine the sense in which they employed terms susceptible of different interpretations. Thus in the case of *The Attorney General* v. *Shore*, (7 *Sim.* 310,) the language of the deed which raised the trust was "to assist poor and godly preachers of Christ's holy gospel." The Unitarans were in possession and claimed the fund, and, among other things, evidence was received, that Lady Hewley, the donor, was a Presbyterian, and a believer in the doctrine of the Trinity. The object of the parol proof was to show that she had not used the term "godly," as applicable to a class of preachers who denied what she esteemed a fundamental doctrine of the gospel. The language in its application was ambiguous; it would be used by a Unitarian in one sense, and by a Trinitarian in another. The one would deem it a part of Christ's "holy gospel" to deny, the

other to assert the divinity of the Savior. If, however, in the case cited, the fund had been claimed by the Methodists or Congregationalists, or any other dissenting evangelical denomination, under the same circumstances, the result, as I apprehend, would have been different. A Presbyterian could, with propriety, be supposed to apply the terms *godly* and *pious* to a sincere Christian preacher, whether attached to the same denomination with himself or not. The words being general and there being nothing in the religious belief of the donor to restrict them necessarily to his own sect, they would receive a more general interpretation. I have referred to the case of Lady Hewley's charity, not only because it received great consideration, but also for the reason that the judges, in their opinions affirming the decree of the lord chancellor in the house of lords, advert to and enforce the rule of evidence to which I have alluded. (*See also The Attorney General* v. *Pearson,* 7 *Sim.* 308, *and Milligan* v. *Mitchell,* 3 *Myl. & Craig,* 72.) It is unnecessary to refer to all the cases which have been cited. So far as they are of authority here, they will be found consistent with the views above suggested.

The following propositions may be fairly deduced from all the cases. 1. That in trusts for charitable or pious uses, the intention of the donor is to govern. 2. That in ascertaining that intention, the language of the trust, if clear and explicit, is conclusive evidence of the intention. 3. That where the language is ambiguous or equivocal, you may resort to extrinsic evidence, not for the purpose of ascertaining the intention of the donor, independent of the deed; but for the purpose of determining the meaning and application of the terms used by him. 4. As a corollary from the above propositions, that general terms are to be construed generally, unless the circumstances under which the trust was made, furnish decisive evidence that they were used in a limited or special sense.

Bearing these principles in mind, let us inquire what are the trusts upon which the property in question was granted, as claimed by the respondents. The substance of the allegation as stated in their bill of complaint and put forth upon the argu-

ment is, that the property in question is held upon the trust, that the same shall be applied to the teaching of the doctrines of *Calvin*, to a congregation or church in connection with and in subordination to the classis of the Reformed Dutch Church, exclusive of all others; and, of course, that a violation of the trust in matter of doctrine, or church government, entitles the respondents to the relief which they claim in equity. The deeds under which the property was held prior to the year 1764 have not been produced. But a bond, or rather a declaration of trust bearing date the 30th July, 1765, has been made an exhibit, and is the only written evidence, having direct reference to the nature of the trust under which the property was held, upon which the church was first erected, and upon which it was rebuilt in 1766. This bond purports to have been executed by persons holding the legal title to two lots upon Nassau-street and runs to John Michael Kern, present pastor of the *Calvinistic* Church, in the city of New-York, worshipping in the German language, and to other persons described as elders and deacons of said church, in the penal sum of £3000. The recital in the condition is that "whereas certain German and Swiss inhabitants of the city of New-York, have lately by contribution purchased a lot of ground, and with the assistance of divers charitable and well disposed persons, have begun and are carrying on the erection of a church thereon, for the worship of God;" and that the fee simple of the land had been vested in the obligors, in joint tenancy, by virtue of certain deeds executed by certain individuals, who are named. The date of the conveyance is then given with a description of the lots—and the condition concludes as follows : " And whereas *all parties* are inclined to preserve the said estate in all times coming, for the pious uses aforesaid : Now therefore, know ye, that the obligors are only intended to be trustees of said property." I infer from other parts of the case, that the grantors referred to were the trustees to whom the property was originally conveyed, and that they, according to the recital, conveyed to the obligors upon the same trust with which it was charged in their hands. They certainly had no right to prescribe any other condition without

a violation of duty which is neither proved nor pretended. Assuming that we have in the above recitals all the conditions which the parties interested in the property thought fit to prescribe, the only question will be as to the sense in which they used the terms from which the trust arises. These terms are of the most general character. The land had been purchased, and a building was to be erected thereon "for the worship of God;" and all parties, as they expressly declare, were inclined to preserve said estate in all times coming, for the *pious uses aforesaid*. There is nothing in these terms relating to church judicatories or to any specific doctrine. It is true that the obligees are described as the present officers of the *Calvinistic* church worshipping in the German tongue, but this is no part of the trust. The declaration of trust is quite a different thing from the persons in whose names a legal obligation is to be enforced, in case of a breach of duty upon the part of the trustees. No one doubts that the terms are sufficiently comprehensive to include Calvinists; but the question returns, whether the use is to be limited to them exclusively, or whether it may not extend to any other evangelical denomination. There certainly is nothing in the terms of the deed to prevent them from participating in the benefit of the fund. Is there anything in the circumstances under which this fund was created, to induce a belief that the expression "worship of God in the German language," was used by the contributors in the limited sense contended for by the respondents? Who were they? The bond says, Germans, Swiss and other charitably disposed persons. Granting that they had been educated in the Reformed church, and were attached to its doctrines and discipline, is there anything inconsistent in such a body of men establishing a fund upon principles sufficiently liberal to embrace all those who agreed with them, as to the essential truths of the gospel; more especially, when they sought aid from the whole Christian community without distinction? In the year 1765, could not the terms "worship of God," be applied with perfect propriety by a member of the German Reformed church to the religious worship of the Presbyterians, Lutherans, Methodists, and so far as

doctrine is concerned, of the Episcopalians, as well as of the Dutch Reformed. History assures us that Zuinglius and the members of his church earnestly sought to be recognized as brethren by Luther and his followers. And it would require more proof than I have discovered in this case to satisfy me that when this property was purchased, the respective followers of these great and good men did not regard each other as Christian brethren. I agree with the chancellor, that the evidence shows that in 1758, a religious society was established, called the German Reformed Church, and that its first members were of that persuasion; but this is far from satisfying me that the contributors to the fund for purchasing this property intended to limit their bounty to the teaching of the doctrines of. Calvin exclusively. They have not said so; and there is nothing in their situation or opinions which would necessarily induce them to confine their bounty to the promulgation of that class of doctrines.

Upon the subject of the church government, or ecclesiastical connection, the declaration of trust is entirely silent. We are not called upon to give a construction to an equivocal or ambiguous phrase, but to add by a resort to extrinsic testimony a new condition to the trust, unless, indeed, we are prepared to determine judicially, that men cannot worship God, in a house erected for that purpose, without the supervision of a bishop or synod. This certainly is not my belief, and I hope it will never be the doctrine of this court. It was not the belief of the founders of this church, if any reliance is to be placed upon their acts. From 1758 to 1764, they established their own discipline, called their clergymen, and dismissed them, without any connection with, or aid solicited or afforded by, any other ecclesiastical body whatever. The Dutch Reformed denomination had at that time a church in the city of New-York, the most influential and wealthy probably in the territory now constituting the Union, which was connected with the Synod of North Holland. Yet no application was made to them, during this period, by this church, for any purpose connected with their ecclesiastical organization. Their clergy were not consulted; they were not requested to moderate their call for their pastor, nor to do any

other act which would be appropriate and necessary upon the supposition that this church was subject, or intended to subject itself, to the control of the judicatories of the Dutch Church. Indeed, the letter to the Classis of Amsterdam, and the resolution of the consistory procured by Dominie Kern, furnish conclusive evidence, that up to January, 1764, this church was to all intents and purposes independent. The letter and resolution state that to avoid the evils incident (in the opinion of Dominie Kern) to a state of independency, they had resolved to unite with the Classis of Amsterdam. The evidence, therefore, of the acts of this society is entirely consistent with the deed. That contains no provision upon the subject of church government, and the history of the church shows, that from its foundation to the year 1764, it was in fact independent.

I am aware that great reliance is placed upon the declarations made at the time of laying the foundation of the new church in Nassau-street. The members of the congregation then repeated the expression,—" to be for a German Reformed Church," and the clergymen declared that " in the house to be built on this foundation stone, shall be taught the word of God according to the reformed doctrine of Heidelberg and Switzerland." This is certainly very satisfactory evidence of the religious creed of the pastor, and also that the congregation intended to establish at that time a German Reformed church, and nothing more. Nothing, it will be observed, was said by either as to the forms of church government. This ceremony was not a declaration of the trusts upon which the donors had contributed. It was neither intended to nor could it have that effect. It was a statement of opinion merely, that a German Reformed congregation worshipping in the house to be erected, and in which was taught the word of God according to the doctrine of Heidelberg and Switzerland, were within the purview of the trust theretofore created; and in this they were undoubtedly correct. There is, however, an important fact in the case which takes from this ceremony its whole effect, as evidence of a trust limited to a particular religious society, or class of doctrines. It is that the formal declaration of trust to which I have referred, and which I have

assumed to state the original conditions to which this property was subject, was executed upon the 30th July, 1765, three months after the ceremony above alluded to, and that the clergyman who made the above declaration is one of the parties to that instrument.   This is satisfactory evidence to my mind, not only of the character of the trust, but that the same was adopted by the contributors to the new church, and that the property was to be applied in conformity with the design of the original founders, and not as the chancellor seems to suppose, to a new trust. If I am correct in this supposition, there would seem to be an end of the question.   For I agree with the vice chancellor that if this church was originally independent, a union with the Dutch church, six years afterwards, did not merge the former in the latter so as to make that union indissoluble.   It left the congregation free to dissolve that connection at such time as their sense of expediency might dictate.

I deem it unnecessary to refer to the subsequent history of this church.   If, as I have attempted to show, the terms of the trust are silent upon the subject of ecclesiastical supervision—if the church, for the period of six years from its formation, was in fact independent—if the terms of the trust deed, providing " for the worship of God in the German language," can, when construed in reference to the existing law, which comprised Christianity among its principles, and to the circumstances and opinions of the donors, be applied to a congregation unrestricted as to church government, and to the promulgation of doctrine at the time esteemed evangelical without regard to sectarian differences—I think we are bound to give the deed such construction. If we insist upon the precise faith held by the founders, it is difficult to say where we are to stop.   If, because a German Reformed church was established, we infer that Calvinism alone should be taught, it must be that doctrine as then understood, including an idea regarding the eucharist which is now discarded by all the churches of this country ; and the notion of a limited atonement, which is rejected by a majority of those taking the general name of Calvinist.

Again, if we are to assume that a German Reformed Church

implies subordination to the Dutch Reformed Church, under the government of a consistory, classis and synod, because this church was in that connection in 1763, then it is a part of the trust that such government be adhered to in all its parts as it then existed; and what then becomes of the act of incorporation under which the temporalities have been managed since 1784, and through which these respondents claim title? The argument is that every thing relating to doctrine and practice must be as it then existed. The book of discipline of the Dutch Church must be deemed incorporated in the trust deed. That book declared that the pastor, elders and deacons, who were all necessarily communicants, should administer the temporalities; but by this act of the congregation they are deprived of that power. The legal title is vested in trustees chosen by the congregation, who, for aught the act prescribes to the contrary, may be infidels. (*Baptist Church in Hartford* v. *Witherell,* 3 *Paige,* 296.) This change, though certainly very important does not, it is admitted, prejudice the title to the property; but what authority have we for saying that the benefactors of the church regarded the system under which the property was managed as less essential than the ecclesiastical connection and government? Again, if the submission to church judicatories is indispensable, what will become of the property which was purchased while the connection was interrupted, or after it had actually ceased? The property acquired while the church was independent must, to preserve consistency, be held in trust for a church under that system of government. The consequence of this would be, that from 1758 to 1763, and from the commencement of the revolution to about 1800, and again from 1823 to this time, we should have one class of trusts; and during the remaining periods of the church's existence another. If, to avoid this difficulty, we determine that the donations made and property subsequently acquired were upon the same trusts indicated by the founders of the church in 1758, the church as we have seen being then independent must remain so; and the union with, not the secession from, the Dutch Church, would be the ground of complaint. We cannot escape these difficulties

in any way, except by adhering to the trust as solemnly declared by the contributors; and, by supposing that within the limits above defined, they intended to vest a discretion in the congregation, or in the trustees as their representatives, upon the subjects of government and of doctrine, to be exercised according to the exigencies of the case.

This case is of great importance as a precedent. The grants to most of our churches, particularly since the act of 1784, are general in their terms, frequently nothing more than a conveyance to the religious incorporation by name. In these cases the corporate or denominational name in connection with the cotemporaneous acts of the corporators, may be a sufficient guide as to the nature of the trust in respect to doctrines esteemed fundamental. If a society incorporated by the name of Unitarian, has for its pastor a Unitarian minister, we could with safety infer from that it was not the intention of the founders that their bounty should be applied to the dissemination of Trinitarian doctrines. But beyond this, in all matters not deemed indispensable, a discretion would be vested in the congregation and their trustees as the representatives of the donors.

Although I do not sympathize in the doubt expressed by the chancellor in *The Baptist Church* v. *Witherell*, (which he has ceased to entertain) whether the trustees of a religious society are not independent of all control, in reference to doctrine and modes of worship, I do most cordially agree with him in opinion that it must be a plain and palpable abuse of trust which will induce a court of equity to interfere, respecting a controversy growing out of a difference in religious and sectarian tenets. Between that extreme which confers all power upon the congregation or the trustees, and the doctrine which subjects the property to forfeiture for departures from doctrine or forms of government, in matters not indispensable to the great ends to be obtained by religious organization, there is a wide interval where we may take our stand, sustained by the law and by a sober and enlightened public sentiment. With all my respect for the high character and great learning of the chancellor, I cannot but believe that the principles applied by him to this case, if adopted by this

court, will cast doubt upon the title to one half of the church property in this state—will be a source of discord—an incentive to controversies and feuds not the less bitter because they are bloodless. If any class of our citizens are of opinion that spiritual blessings can only flow in a particular channel; if the church or a creed in their minds usurps the place of the revelation upon which they suppose them to be founded, and if such persons found churches, they must declare their opinions explicitly, to have them respected. Such was not the belief of the plain men who established this church. They have left enough upon record to show that they were anxious that the essential truths of Christianity, which were recognized by the great body of the reformers of that day, should be preached to them and to their children. This has been done. If we go farther and bind this church to a particular creed and compel a reluctant submission to a judicatory whose authority they have renounced, it will, in my opinion, be the act of this court, and not that of the founders of the charity. I am of opinion that the decree appealed from should be reversed.

BARLOW, Senator, also delivered a written opinion, in favor of reversing the decree of the court of chancery, stating and enforcing the following conclusions: (1) That where property is contributed to found or endow a church or religious society or corporation without an explicit declaration in the act of donation that it is to be held for the support or advancement of any particular religious doctrines, a majority of the members of such church or society, or the trustees if the church be incorporated, are at liberty to deviate from the doctrine which prevailed at the time of the donation, and that such deviation will not produce a forteiture of such property, or entitle a minority adhering to the faith professed when the donation was made to the enjoyment of such property, to the exclusion of the majority who have brought about or acquiesced in the change. (2) That where property is *in terms* conveyed upon trust to support a particular form of worship or to provide for the teaching of the doctrines of a particular denomination of Christians, the court of chancery

will enforce such trust and prevent a perversion of the property to other purposes. And (3) That in this case no portion of the temporalities in controversy appears to have been conveyed or contributed upon any trusts relating to religious doctrine or church government; but if this were otherwise that there has been no such material deviation from the former faith or practice as would authorize the interposition of the court of chancery.

BEERS, Senator. The appellants in this suit it is conceded are the lawful trustees of the corporation of the German Reformed Church in the city of New-York. The respondents, who are members of this corporation, ask that the property shall be taken from the appellants' control, because they are perverting it from the use to which as trustees they are bound to apply it. This proposition the respondents must establish or their prayer cannot be granted.

The corporation of the German Reformed Church of the city of New-York, as known to the law, became such on the 11th of June, 1784, under the general act of the legislature for the incorporation of religious societies. The lots on which the church stands, were on the 2d day of November of that year, conveyed to Henry Whitman and others, trustees of said corporation, for them and their successors to hold as trustees as aforesaid. As the validity of this organization and deed are not denied by the respondents, it is conceived that the proceedings from which this corporation and its first trustees derived their legal existence will aid much in defining the object of the incorporation and the duties of those officers who were to effectuate that object, and this more especially if these proceedings, instead of being involved in doubt and characterized by haste, disorder or conflict, are on the contrary distinguished by harmony, order and mature deliberation, and recorded with perspicuity. Referring to those proceedings, it will be found that in the month of May, 1784, a church council was summoned upon request of Dr. Livingston, to consider whether the Reformed congregation would enter with the large or small ecclesiastical assembly of the Low Dutch Church, or would be under its protection. After mature delibe-

ration it was unanimously concluded, *never to vote for such a union.* And certain reasons were specified in a protocol as they declared, "for the information of posterity." At the same council it was unanimously concluded to have the church incor porated, and that the property, except the alms which were declared not to be a temporality, should be delivered to the trustees. If these proceedings remain of any force, it would seem that the appellants should not be held guilty of a breach of trust in not recognizing the jurisdiction of the Dutch Reform- ed Church.

The only remaining question is, whether this court are to wrest the temporalities from the appellants because they are using them as a means to promulgate doctrines essentially variant from those which the property they hold was designed to ad- vance. To solve this point, it is necessary to ascertain what duties were imposed upon the trustees in regard to doctrinal matters. All they could be required to do in this respect was to pay the salary of the individual who should by the proper au- thority be selected to minister to the church in word and doc- trine, and to see that the church was open for his ministrations. They as trustees certainly had nothing to do in designating who this individual should be, and as trustees had no right to deter- mine his orthodoxy. This latter right and duty rested in other hands. If, therefore, the spiritual teacher of this church and congregation has been designated by those upon whom that duty devolved, the trustees have no right to shut the doors of the church against him, or to withhold his pay because they may deem him unsound in the faith. They would be guilty of a palpable breach of trust by so doing. If the duty of choosing the shepherd of this flock be committed to the classis of the Dutch Reformed Church—or if to the judicatories of the German Reformed Church—or if to the flock itself, and that delicate trust has been performed by that one of these bodies to which it shall be determined to belong, then it is the duty of the trustees to use the temporalities of this corporation in such manner only as shall aid the shepherd thus selected to feed the flock in his own way. If he shall prove a mere hireling, and lead them to sterile mountains

and among wolves; instead of green pastures by the side of peaceful waters, he must answer for it to his spiritual superiors, and not to the trustees.

Being convinced that those pastors of the German Reformed Church in the city of New-York of whose tenets the respondents complain, were selected by those to whom that duty belonged, and that the appellants as trustees of the temporalities only have used them to sustain the pastors thus properly designated—it follows that the decree of the chancellor in this case should be reversed, and that of the vice chancellor affirmed.

FOLSOM, Senator, delivered a written opinion in favor of reversing the decree appealed from, on the grounds, (1) That the deviation from the faith and practice prevailing in the church at former periods, if indeed there was any such deviation proved, was too slight and unimportant to warrant the interposition of the court below; even if such interposition on account of an alleged departure from the belief of the founders or benefactors of a church would ever be justifiable, which was considered to be a matter of doubt. (2) That the connection formerly subsisting between the church in question and the Reformed Dutch Church was voluntary and was never binding on the former, and was now at an end. (3) That the court of chancery is deprived of jurisdiction by the provisions of the statute. (2 *R. S.* 466, § 57.) And (4) that the order of the vice chancellor in the former suit mentioned in the pleadings and proofs was a bar to the relief sought in this suit.

PORTER, Senator. There is involved in the decision of this case, the very grave question, whether property, originally given by the founders of a church, for the use of that particular church, shall forever thereafter be devoted to the teaching of the particular religious doctrines and tenets, and be subjected to the particular form of church government, which were established in the church by its original patrons and founders. The principle involved must necessarily take a wide range, and affect a vast amount of property held for religious and charitable uses; and,

what is perhaps of far more consequence, exert an extensive, influence upon the peace and good government of the various churches in this country. All denominations of Christian worshippers have an interest in the question; for unless the title to property held in trust for religious and charitable uses is to be determined by the courts, as intimately connected with the doctrines and faith and form of church government, established by the patrons and founders of each church, there can be no stability in the churches, nor even a faithful execution of the trusts. But the character and integrity of the government is concerned in seeing all such trusts protected and faithfully executed.

Much theological learning has been employed by the chancellor and vice chancellor, in the examination they have given of certain religious tenets, and in exhibiting the points in which eminent theologians of past centuries have agreed or disagreed, and in applying the results of their investigations to the case before the court; but it appears to me that the question between these parties does not depend upon the point, whether the doctrines and practices of the German Reformed Church and those of the Lutheran Church are, or are not, wide apart; or whether or not the Heidelberg Catechism is so worded as to be susceptible of an Arminian construction. These nice points may be appropriate subjects for religious controversialists, and they perhaps furnish the occasion for the division of churches; but from the view I have taken of the law and the facts of the case, the only questions that seem to me necessarily to arise are these: 1. Was this a Calvinistic church in its origin, within the views and objects of its founders, as contradistinguished from Lutheranism? 2. Has it been converted into a Lutheran church by the appellants, or those to whom they have succeeded in its management? 3. Was it in its origin, and by its founders, placed under the government and judicatories of the Reformed Dutch Church? and if so, has any thing since taken place that could legally absolve this church from its subjection to the judicatories of the Dutch Church?

Before discussing these questions I will advert to some principles of law applicable to the case, which I think should be borne

VOL. II.*                 70

in mind while drawing our conclusions from the facts which are given in evidence. It is unnecessary to refer to particular parts of the proofs to show that from about the year 1758 to 1766, considerable sums of money had been contributed by the founders of the German Reformed Church in New-York for the purchase of a site for a church, and towards the erection of a church edifice. It was these benefactions by individuals who worshipped in that church, and belonged to that religious community, and perhaps by others who felt a desire to promote the same object, that laid the foundation of that religious charity, the possession and administration of which forms the subject matter of this controversy. Those who bestowed their bounty in this direction had an object in building up a society of religious worshippers, and in contributing to the establishment of a church which professed the doctrines and tenets, and submitted to the government which that church professed, and by which it was controlled. It is not material now to inquire and decide what those doctrines were, nor what the government was; but only to determine, that up to about 1766 when their new church was built, there were certain doctrines, and rules of faith and practice in matters of religion, as connected with that church, which were recognized and established, and by which that community of the German Reformed Church regulated the rights of membership and of participation in its privileges. Those were rights which the law protected. There is no evidence in the case that during the period I have mentioned there had been any variation in the articles of faith adopted in that church. What they were in 1766, they therefore had been from the time when, prior to 1758, a few "German Reformed members" first made a subscription to ascertain whether they could "support a preacher," of their own particular faith. This society then had property, held by trustees for the spiritual use of its members; and it was at that time stamped with the impression of the faith of its founders. Here was an appropriation of the property of this religious society for its support, and for teaching the religious doctrines which were there professed. We have then at that time a religious society, which has its own articles of faith

which distinguish it from other religious denominations. It has property charitably bestowed and held in trust for the pious use of promoting the spiritual prosperity of that society, and for the perpetuation of the same faith. The inquiry then arises, Will the law permit those who have the management of the fund, to use that fund to promote the teaching of another faith? It is very clearly established that it will not. In the case of *The Attorney General* v. *Shore*, (7 *Sim. Rep.* 290, *n.*) Lord Lyndhurst says, "In every case of charity, whether the object of the charity be directed to religious purposes or to purposes purely civil, it is the duty of the court to give effect to the intent of the founder, provided this can be done without infringing any known rule of law. It is a principle that is uniformly acted upon in courts of equity." "It becomes the duty of the court to ascertain by evidence, as well as it is able, what was the intent of the founder of the charity. It is a question of evidence, and that evidence will vary with the circumstances of each particular case. It is a question of fact to be determined; and the moment the fact is known and ascertained, then the application of the principle is clear and easy. It can scarcely be necessary to cite authority in support of these principles. They are founded in common sense and common justice." In *The Attorney General* v. *Pearson*, (3 *Meriv.* 400,) Lord Eldon says, "If it turn out that the institution was established for the express purpose of such form of religious worship, or for the teaching of such particular doctrines, as the founder has thought most conformable to the principles of the Christian religion, I do not apprehend that it is in the power of individuals having the management of that institution at any time to alter the purpose for which it was founded; or to say to the remaining members, 'We have changed our opinions, and you who assemble in this place for the purpose of hearing the doctrines and joining in the worship prescribed by the founder, shall no longer enjoy the benefit he intended for you, unless you conform to the alteration which has taken place in our opinions.'"

We have here property devoted by the donors to pious uses, and to be administered by a particular Christian church, which

held certain well known religious opinions, and which church was under the government of certain ecclesiastical authority; and if the court can ascertain precisely what those tenets were, and what church government was within the views of the donors, it is the province of the court and its duty to direct the property to be placed in the hands of those who acknowledge the same doctrines, and obey the same authority. Any attempt to take the property thus devoted from the control of those of that faith and government, is a breach of the charitable use of the donors, and the court is bound to furnish a remedy. They must look upon it as a trust sanctioned by law, one which is to be enforced if necessary by the courts. In *Field* v. *Field*, (9 *Wend.* 401,) Nelson, J. in delivering the opinion of the court says, "the question is not which faith or doctrine is most orthodox; this is not the object of the inquiry, but for what object or purpose was the fund originally established by the founders of it. The court proceed to enforce the observance and execution of an ascertained trust, in which rights of property are concerned, not the peculiar doctrines or faith of either party, though their existence and the nature of them may be incidentally involved in the course of the proceeding." It cannot be useful to multiply authorities upon this subject. It must be considered settled, that when it is proved that property is held upon trust, and devoted to pious or charitable uses, the purposes of the donors shall not be violated; and that those trustees who undertake to pervert the charity to other uses, will be divested of the trust.

Such being the principles of law, and the duty of a court of equity, it becomes necessary to inquire into the facts of this case. Before doing so, I will advert for a moment to a general view of the Dutch Reformed and German Reformed churches in this country previous to the year 1771. The German Reformed churches were principally located in Pennsylvania, while the Dutch were situated in the colony of New-York. It appears from the history of those churches, that prior to the time above mentioned, they were under the immediate jurisdiction and government of the classis of Amsterdam, in Holland, which was

itself in subjection to the Synod of North Holland. This juris-
diction extended even to the licensing and ordaining of ministers,
to the hearing of all cases of ecclesiastical controversy, not
excepting such as concerned the discipline of church members.
This was, indeed, a degrading state of vassalage, little in ac-
cordance with the American spirit of freedom of action and of
thought, which began to manifest itself anterior to the origin of
the church in question. At the period when this church was
formed, the ministers of the Dutch and German Reformed
churches, had either to be imported from Holland or Germany,
or sent thither to be educated and ordained before they could
be admitted to preach and perform the other functions of their
office. Strange as it may now appear to us, there was a large
party in the Dutch Reformed Church, that adhered rigidly to
this foreign jurisdiction; and the disputes arising out of this
question were carried to such a height as to threaten even the
existence of that church in this country. In 1771 the American
party obtained the ascendency; and in the following year they
established American church courts in that church, in which
act this German Reformed Church participated. But it was
many years after, before the same reformation took place in the
German Reformed Church in this country. This revolution in
the Dutch Church was effected peaceably, with the sanction of
the Synod of North Holland, and the Classis of Amsterdam.
The whole government of the Dutch Church was administered
after 1772, by local classes and synods. All the Dutch Re-
formed churches in New-York, and also the church in question,
acknowledged the jurisdiction of the classis of New-York, and
of course became integral parts of that church, as one body,
governed by its constitution and subject to its judicatories.

I will now inquire whether the church in question was, in its
origin, a Calvinistic church. It is not pretended but that the
Dutch Reformed and German Reformed churches in this coun-
try were, and had been from their first formation, Calvinistic in
their doctrines; and very strongly and decidedly opposed to the
doctrines of the Lutheran church. Indeed the German Protes-
tant churches, which embraced Calvinism, took the name of

German Reformed, to distinguish them from the German Lutheran churches. That there had existed from an early period in the history of the reformation, and does still exist, a marked, striking and irreconcilable difference in doctrine between Calvinists and Lutherans, is a fact of such notoriety as not to require proof. I should deem it an act of supererogation to search among the learned doctors who have expounded the creeds of the two sects, for the evidences of that difference; for I cannot suppose that it is denied or doubted, that such difference exists. I shall, therefore, assume it as an historical truth, that so far as this case is concerned, and in respect to the applicability of the law above quoted, there is a difference; and one as material in this controversy as if one of these parties had been of the Episcopal or Catholic faith.

The first and far the most important piece of testimony upon the particular tenets held by this church in its earliest formation, and during the first few years of its history, is found in the letter written by the minister, elders and deacons of this church to the Classis of Amsterdam, in 1766. It is indeed, the only account we have of its early history. From this letter it appears that a considerable number of protestant Germans had settled from time to time in New-York, and many of them had attached themselves to the Dutch Reformed Church; which it will be remembered was strictly Calvinistic, and was based upon and rigidly enforced the articles of faith which were settled in the Synod of Dort, in 1618 and 1619. Those who thus attended the Dutch Church had acquired some knowledge of the Holland language, which was used in that church; but others who had no knowledge of that language, were, in the language of the letter " *compelled* to hear the preaching of God's word, in the *German Lutheran Church.*" Here we have the proof, that prior to the year 1758, there was in New-York a German Lutheran Church, and a Dutch Reformed Calvinistic Church, and that such of the Germans referred to in that letter, as had any knowledge of the Dutch language, attended the Dutch Church, and such of them as could not understand preaching in Dutch, were compelled to hear God's word preached, if they heard it at all, in the Lutheran

Church. This affords a plain recognition of the difference then existing among the Germans—part were Calvinists and part Lutherans. The letter proceeds: "This *deplorable condition* induced those who had resided here some years, to reflect whether some plan might not be devised to establish the worship of God in their mother language." What is this "deplorable condition" to which the writers refer? It was the fact that some of their number had been compelled, owing to their ignorance of the Dutch language, and there being no Calvinistic German preaching in the city, to "hear God's word preached in the German Lutheran Church." The elders and deacons who probably assisted in the formation of this church, and well understood the prevailing feeling among their brethren at the time, call it a "deplorable condition." No stronger language could well be used to express their opposition to Lutheranism. There can be no reasonable doubt, I think, but that those Germans who collected together and formed this church were Calvinists; and that the church was organized for the very reason that they could not consistently with their religious faith, hear Lutheran preaching. The letter then gives an account of the purchase of a church by those Germans; of the troubles they had with their first pastors, and the arrival of Dominie Kern, in 1763; of his representing to them that independency in churches was very dangerous both to church and pastor, and that they resolved in Oct. 1763, to form a connection of that church with the Classis of Amsterdam. This connection which took place formally in June, 1764, is additonal and conclusive proof of the Calvinistic character or the worshippers in that church. With a full knowledge both by pastor and people, of the character of the Dutch Church in this respect, we find them uniting readily with that church, and placing themselves under its ecclesiastical jurisdiction. I would also advert to the declaration of trust executed in 1765, the year in which the church was rebuilt. It commences with the form of a penal bond, and the condition is, that the signers will hold the premises described, which "certain Ger man and Swiss inhabitants of New-York had lately purchased by contribution and with the assistance of divers charitable per-

Miller v. Gable.

sons, and had begun and were carrying on the erection of a church thereon for the worship of God," in trust for this society. Their minister is one of the obligees; and he is described as "the Rev. John Michael Kern, minister of the gospel, and present pastor of the *Calvinistic* Church, worshipping in the German tongue." A recital in the deed says "and whereas all parties are inclined to preserve the said estate, in all times coming, *for the pious uses aforesaid;*" which very plainly means the pious use of a Calvinistic Church for the worship of God, being the only use previously mentioned. And as it is called in the deed a Calvinistic Church, any other use would be a perversion of the trust. I cannot better illustrate the opposition between the Lutheran and Reformed Dutch denominations than by quoting what the Rev. Mr. Muhlenburgh, who is called a venerable patriarch of American Lutheranism, says in his account of the first Lutheran society in that city. "Whilst the territory," he states, "yet belonged to Holland, the few Low Dutch Lutherans were compelled to hold their worship in private; but after it passed into the possession of the British in 1664, liberty was granted them, by all the successive governors, to conduct their worship publicly, without any obstruction." During this period, it should be remembered, the prevailing religious sect, among the inhabitants of New-York and the rest of the colony, was the Dutch Reformed, as established by the Synod of Dort.

From the period of the union with the Dutch Reformed church in 1764, to the dispersion that took place in consequence of the occupation of New-York by the British in the American revolution, the connection between this church and the Dutch church was in all respects complete. They had one faith and one government. This church was represented in the church courts; and in all matters of faith and discipline was subject to the appropriate tribunal of the Dutch Reformed church. The Rev. C. F. Foering was settled over this church as its pastor, in 1772, and the act of installation was performed by Dr. Laidlie, one of the preachers of the Dutch church.

From all these facts, I conclude that this church was in its

Miller *v.* Gable.

formation, and so continued at least until the revolutionary war, a Calvinistic church in its strictest sense. It was during this time that the donations and contributions were made, with which the first church was bought, and the new one built. It appears by the case, that after the new church was built, in 1765, the society had contracted a large debt in building, beyond what it then was able to collect from its members. It is reasonable to presume that this debt was soon after discharged from the donations of its friends, as nothing further is said of it. All these contributions and donations were made to a religious community, professing a Calvinistic faith, and governed for the greater part of the time, and all the time after they had placed themselves under any church government, by the judicatories of the Dutch Reformed Church, which professed the same faith. The property thus acquired by this church before the war, formed the larger portion of all they ever acquired, as far as I can discover from the case. This property was devoted by the donors to the pious use of sustaining religious worship in that church, according to the faith and doctrines professed and preached therein at the time ; and those in that church who still adhere to that faith, have a right that the trusts then created shall be enforced. I know of no exception to this rule, unless the whole church have become converts to a new faith. If any remain true to the doctrines of the founders, they have a legal right to call upon the court of chancery to save the trust from any attempted perversion.

The next question is whether the appellants have, as alleged, converted this church into a Lutheran church. It is admitted that the present trustees, or those who hold possession of the property and claim to be the rightful trustees, have cast off the jurisdiction of the Dutch church, and so far have rejected Calvinism. And when it is remembered that by the constitution of the Dutch church, of which this church was a member at one time, no pastor can be settled over any church under their care without the approbation of the classis, it will be seen, that the repudiation of the authority of the classis is no inconsiderable item of proof upon this point; for they might well suppose

that the classis would never consent to the settlement of a pastor over that church, unless his doctrinal sentiments corresponded with those of the Dutch church.

I find no evidence that this church, or any portion of it, had departed from the faith and doctrines of its founders; nor that any attempt had been made to ingraft upon the church another faith, until the year 1823. From its foundation in 1758, until that time, a period of 65 years, it had been uniform in its support of Calvinistic doctrines, however much it had rebelled against the government of the Dutch church. In that year the testimony shows that efforts commenced to convert it into a Lutheran church. David Fisher swears that in 1823, after the church had removed to Forsyth-street, a desire was shown by some of the leading members to make it a Lutheran church; and that he left the church, among other reasons, because an intention had been avowed, of calling a Lutheran minister. John P. Dietrich also proves that the minority, that year, expressed a determination to connect the church, if possible, with the Lutheran church. From that time they broke off all connection with the Dutch Reformed church, and claimed to be an independent church. And that claim is still insisted upon. There is nothing of importance in the proceedings of the church from this time, that proves the doctrines that prevailed, or the character of the pastors, until 1834, when they settled the Rev. Mr. Smith. He was their pastor until 1837, when he died. The respondents introduced the Rev. W. D. Strobell as a witness, who states that he is a pastor of a Lutheran church, and secretary of the Lutheran ministerium of the state of New-York; that he knew the Rev. Lewis Smith; that he was also a member of the Lutheran *ministerium;* that he lived and died a member of that body; as were also the Rev. Mr. Geisenhamer, and the Rev. Mr. Myer. The father of Mr. Smith proves that he was educated as a Lutheran minister and licensed to preach as such; and there is no evidence that he ever professed any other doctrine, or submitted to any other ecclesiastical connection than Lutheran. The following is some part of the examination of Mr. Myer, and it shows what doctrines he held.

"Before you accepted the call, did you not think it incumbent upon you to ascertain the particular faith of the church? I did not. Do you think you could, while a Lutheran, with propriety assume the situation of pastor to a Calvinistic church? By my standard of propriety, I thought it perfectly proper to do so." "If a church was originally established as a church receiving the Calvinistic system of religion, do you think it could ever pass into the hands of members of the Zuinglian church, and still preserve its identity? Of course it could not." "If you had not supposed that the church in question received the faith of Zuinglius, as distinguishing it from the branch of the same church receiving the faith of Calvin, do you think that you could have with propriety obligated yourself to preach its faith? I think not, not being willing to preach Calvinism."

After the exhibition of these facts, it appears to me, that I cannot be mistaken in saying that the proof is full to show that since 1834, at least, the trustees of this church have applied the trust funds in their hands, and are still applying them, to the support of a sect essentially varying in faith and doctrine from the founders of the church, and the donors of the fund. So far as religious teaching is concerned, that property which was given by the donors in trust and confidence that those who ever after should be called to administer it would employ it in the support of the Calvinistic faith, has been perverted to the support of another faith. This I deem a breach of the trust upon which the fund was originally appropriated. The will of the donors has been disregarded; and those who have taken it in charge under a promise to employ it according to the pious use designed by the founders, have in truth used it to sustain a different faith. I might add, that from the whole course of examination of witnesses by the appellants' counsel, it does not appear that their object was to prove that their clients were not Lutherans; but to show that there was no material difference between Lutherans and Calvinists. All ecclesiastical history refutes such a position; and the testimony in this case abundantly confirms the historical accounts of the difference.

The third question in this case which I will now proceed to

discuss, relates to the *government* of this German Reformed Church. In the first place, what is the law on this subject? In the case of *The Presbyterian Cong.* v. *Johnston*, (1 *Watts & Serg.* 37,) Gibson, Ch. J. says, "I concede that subjection to a particular judicatory may be made a fundamental condition of a grant. And even without an express condition, it might be a breach of the compact of association, for the majority of a congregation to go over to a sect of a different denomination, though it were different only in name. For instance, a majority of a congregation of seceders could not carry the church property into the Presbyterian connection; though these two sects have the same standards and plans of government." Again, in *Den* v. *Bolton*, (7 *Halst.* 205,) we find the same principle. Until January, 1824, "the Dutch Reformed Church in the English neighborhood" in Bergen, N. J. belonged to the Classis of Bergen. At that time a meeting was held in the church, consisting of the elders, deacons and twenty-five heads of families, in which it was determined to dissolve their connection with the Classis of Bergen. On the same day the consistory of that church met and resolved that their connection with the Classis of Bergen, and the general synod was dissolved, and they protested against the authority of the classis and synod, inasmuch as those bodies had departed from the doctrines and standards of the Reformed Dutch Church. Here all the trustees concur in this act of separation. Upon this case the court say, "The residue of the congregation remained members of that church, classis and synod; deprived of their spiritual leaders, but in no degree deprived of their standing in the church, or having their rights taken away or impaired. Though those who withdraw still adhere to the faith and doctrines of the Reformed Dutch Church, as contained in its standards; yet simply holding the same faith, without submitting to the government and discipline of a church, cannot keep a man a member of that church. Members of the Dutch Reformed Church, and of the Presbyterian Church, are not members of the same church, though their faith is the same; the difference between them consisting in the form and mode of church government. To constitute a member of

any church, two points at least are essential, a profession of its faith and submission to its government." To these principles I fully assent. There must necessarily be government in every church, as well for the due regulation of its temporal affairs as for the preservation of the integrity of its faith. No stronger instance can well be imagined than the one before the court, to illustrate the importance of preserving the supervision of church judicatories. If this church had not thrown off its subordination to the government of the Classis of the Dutch Church, it could not have become Lutheran in its doctrine. Any minister to whom they would have tendered a call to be their pastor, would then have been obliged to submit to an examination of a committee of the classis, and if not found sound in Calvinistic doctrine would have been rejected; and thus the church would have been preserved in the faith of the founders; and the trusts connected with the donation of the estate would have been executed.

But it is denied by the appellants that this church was ever under the jurisdiction of the courts of the Dutch Reformed Church; and they go further, and insist that all religious societies, in regard to the management of their temporalities, are free and independent of all church judicatories; a position utterly at variance with all legal decisions, and one that surrenders all property held in trust for pious and charitable uses, to the fitful management and caprice of the ever varying feelings and motives of trustees. Such a doctrine is rejected with some warmth by the vice chancellor; and I should deplore the day in which it received any judicial countenance. I shall certainly spend no time in refuting it; but will inquire into the facts in this case that will throw light upon the question, whether this church has been at all times an independent church.

I have shown, I think, that it was Calvinistic in its origin, and that in 1763, upon the representation of its pastor, Dominie Kern, that "independency in churches was dangerous both to the church and pastor," this church resolved to join the Classis of Amsterdam. In June, 1764, its pastor received an invitation to attend a conference of the Dutch Reformed Church;

and thereupon the consistory of this church had a meeting, in which it was again resolved, "That inasmuch as by subordination to the Classis of Amsterdam, the best interest of this church can be better promoted, than by standing independent, the necessary credentials for this purpose be duly prepared and undersigned." They accordingly chose delegates who attended the conference; and this connection and subordination continued in fact and in form from that time to 1772, when the Dutch Reformed Church in America formed an independent government of its own with the consent of the Synod of North Holland. This church was represented in the assembly that formed the constitution of the Dutch Church, and assented to its acts. From that time it formed a part of the Classis of New-York, and was represented in it, and was as completely in subjection to it, as any other church in its connection, until the war of the revolution broke out. It was during this period that the larger portion of the property in question was acquired from donations and subscriptions. For all the purposes of this argument this connection must be deemed continued in form until 1784. In May of that year, the consistory met at the request of Dr. Livingston, who was engaged in reorganizing the judicatories of the Dutch Church, to consider "whether they would be," in their own language, "*for the future* under the protection of the said assembly, or of the synodal decrets." And they resolved never to vote for that union, and set down certain reasons, "for the information of posterity." These reasons contain an explicit admission of the former union with and subordination to the Classis of the Dutch Church. And we have also the legal opinion of the consistory, "that in the way of law and right the congregation ought to be independent of all churches of other nations and languages." Not independent, in the sense that the appellants use the term, but only of all other nations and languages. At the same time that they express this resolution, that there may be no mistake as to their meaning, they put on record the expression of their design to unite in forming church judicatories in union with other German congregations when they shall be sufficiently numerous. All their difficulties and

objections seem to arise from a difference of language. In con-
sequence of these proceedings that church failed to be repre-
sented in the Dutch Classis from that time until the year 1800.
Previous to 1799 the Classis of the Dutch Church invited this
church to resume their relation with, and to have delegates
again take their seats in the classis; and in December of that
year the consistory of this church *unanimously* resolved that
the invitation be accepted, and that Mr. Milledoller, their pastor,
make the necessary arrangements for carrying it into effect. In
1800 the church was represented in the classis, and a union in
form was again effected; which continued without any material
interruption until 1823. During this period this church was
confessedly under the jurisdiction of the classis, asked its aid
and direction according to the formulas of the Dutch Reformed
Church, in settling and dismissing its pastors, and was in all
respects as it had been from 1764 to 1784, in subordination to
the government of that church. In 1823 troubles broke out
afresh in this church; and it appears from the minutes of the
classis, that it had been represented to them, that the consistory
and trustees of the German Reformed Church contemplated dissol-
ving the connection of said church with the classis, and con
necting themselves with the German Lutheran Church. The
classis appointed a committee to consult with the officers of this
church, and with authority to state that the classis would not
consent to their dismission. In the preceding month of Febru-
ary, the congregation had a meeting at which they passed a
resolution, in which they disavowed all connection with the
classis of the Dutch Church. It also appears from the testimony
of witnesses and the minutes of the classis, that in October, 1823,
an application was made by the consistory of this church to
the classis, to be dismissed from that classis, and transferred to
the German Reformed Synod of the United States, and that
that application was urged upon the classis by delegates from
the consistory; but it was refused. From that time there has
been no jurisdiction or authority exercised over this church by
the classis of the Dutch Church. After the death of the Rev.
Mr. Smith, in 1837, an attempt was made to revive the former

connection, and the result was this suit. We then have this German Reformed Church, agreeing in all respects in faith and doctrine with the Dutch Church, seeking and perfecting a cordial union with that church in 1764, identifying itself also in government and discipline with that church, and participating in its judicatories for twenty years, so far as the acts of the parties were concerned. For the next sixteen years, we find that this church declined to send delegates to meetings of the classis, and refused to acknowledge its authority, and stated their reasons for such refusal. But during this period the action of the classis was merely that of forbearance; not a surrender of its right of jurisdiction. In 1800 the connection was resumed, and the authority of the classis unanimously acknowledged, and actively exercised for the next twenty-two years; when the attempt was again made by a majority of this church to throw off the government of its judicatories. But conscious of their inability to effect it by their own motion, the consistory made a formal application to the classis to be dismissed from its connection and jurisdiction. That request being denied them, they have since omitted to be represented in the classis, and denied its right of government. And the question now is, is this church rightfully under the government and subject to the authority of the classis of the Dutch Reformed Church? It seems to me that a simple statement of the facts in relation to its connection with the judicatories of that church furnishes a ready answer to the question. Unless the principle can be maintained that churches may form and dissolve their allegiance to the regularly constituted church judicatories at pleasure; and preserve all their rights to property held in trust for their use, I can find no argument for saying that the authority of the classis is in the least impaired. On the contrary, I maintain that it was not in the power of the consistory, nor of the congregation by a majority vote, to effect a separation. The cases I have cited establish that doctrine fully, and show that those only who remain faithful in their allegiance to the government of the church, are the rightful members of the church, and the only *cestuis que trust* of the property held for the use of that

Miller v. Gable.

church. Any other doctrine strikes at the foundation of all order; and abandons all protection of property given in trust for pious uses. Should the courts refuse to carry this principle into effect, they will virtually say to the donors of these most interesting charities, "If those to whose care and fidelity you have entrusted the funds given and designed by you to be expended in particular pious uses, shall decide to devote them to other uses, we have not the right and power to remove or restrain them." This I trust the courts will never say. One of the most useful instances of the exercise of equity power, is its guardianship of trust estates. And such especially, as are held for charitable and pious uses, should call for the vigilance of that court, in securing the administration of them, according to the will and expectation of the donors.

I conclude by expressing my opinion that the fund in question in this case was given in trust for the support of the worship of God, in the German Reformed Church in New-York; and that the doctrines to be taught there should be those usually maintained by the adherents to the Calvinistic faith; and moreover that in order to secure the church against innovation of doctrine, or other defection, it should continue under the government and discipline of the judicatories of the Dutch Reformed Church. The appellants, who now hold this fund, deny that they hold it on any such condition or trust, and refuse to acknowledge any such trust. They were elected trustees by those who deny the supervisory power of the classis of the Dutch Church, and who have introduced Lutheranism. That proceeding I consider void, and am of opinion that the appellants have no lawful control over the fund.

I see no reason for questioning the regularity of the election of the respondents. Since 1837 they and their friends have kept up a regular succession of trustees, chosen by those who adhered to the faith and government of the church—the only persons entitled to vote for trustees. The fund should be committed to their hands.

There is no force in the objection arising out of the dismissal of a former bill by the vice chancellor. His decision was not

founded upon the merits; but the order was rather entered by consent.

The decree of the chancellor should be affirmed.

On the question being put, "Shall this decree be reversed?" the members of the court voted as follows:

*For reversal :* The PRESIDENT, Mr. *Justice* JEWETT, and *Senators* BARLOW, BEERS, BOCKEE, BURNHAM, CHAMBERLAIN, FOLSOM, HARD, JOHNSON, LESTER, SEDGWICK, TALCOTT and WRIGHT—14.

*For affirmance :* *Senators* BACKUS, DEYO and PORTER—3.

Decree reversed.(*a*)

(*a*) The first three propositions of the reporter's abstract are stated with some hesitation, but are believed to be the reasonable result of the opinions given in this court taken in connection with those delivered in the court below : but it must be conceded that they are not authoritatively established by the judgment of this court. The other points stated in the abstract are mainly the opinions of individual members of the court, it being impossible to collect the grounds upon which a majority placed the judgment of reversal.

For a further discussion of the principal questions involved in this case, see *Knis kern* v. *The Lutheran Churches of St. John's and St. Peter's,* (1 *Sandford's Ch R.* 439.)