Harrington, Ch. J.,

dissented, for the reasons announced by him in the Court below, which were as follows:
*134 I have no donbt of the jurisdiction of the Court to restore by mandamus a minister illegally excluded from a pulpit which he has the right to occupy. The application of this writ to that extent was affirmed by Lord Mansfield, in Rex v. Barker, 3 Burr. 1265, the principle of which decision has been since applied in a multitude of cases in England and in the United States. “Where there is a right to execute an office, perform a service, or exercise a franchise, more especially if it be in a matter of public concern, or attended with profit, and a person is kept out of possession, or dispossessed of such right, and has no other specific legal remedy, this Court ought to assist by mandamus, upon reasons of justice, and upon reasons of public policy, to preserve peace, order, and good government.”
1. It is no objection whatever to the exercise of this jurisdiction that the office or right appertains to a religious society, or that the ascertaining the right of the relator to be restored involves an inquiry into church government or tenets. If it be necessary, to enable the Court to exercise its jurisdiction and administer that justice which will otherwise fail, the Court will do both. It will not assume to judge of the scriptural correctness of tenets or the propriety of discipline, but it will inquire what they are, if such inquiry connects itself with the title claimed to the office, place, or right sought; and if a minister duly authorized, according to the constitution and discipline of a church, to occupy its pulpit and teach its doctrines, be illegally deprived of this right, or prevented from its exercise, that is a proper case for the writ of mandamus within the jurisdiction of 'this Court to prevent a failure of justic'e. The People v. Steele, 2 Barbour R. 402.
2. The mode of proceeding is by petition, rules and answer, or return; a preliminary rule to show cause is common, but not essential. The first writ of mandamus being in the alternative, is equivalent to the rule to show cause, and may be issued in a clear case presented by the petition. The return must be positive, pointed, and distinct in denial of the facts, and sufficient in itself, for it cannot be tra *135 versed. It may not state conclusions of law, and, if it set up a different constitution, it must still negative the one alleged; and, when the writ sets out the mode of election, it will not be sufficient for the return to say he was not elected, or not duly elected,-but it must traverse some of the facts of the election as alleged. Wilcock on Corp. § 179-80, &c.; Ang. and Ames on Corp. 669.
The important questions in this case are, whether Ellis Sanders has been duly appointed and inducted as the elder minister of this church according to its constitution and discipline ? whether he has the charge of that church, and the right to occupy its pulpit, to preach and dispense its ordinances ?
The petition states such an appointment, induction, and right, with the manner of the appointment, and the facts at large. It states the association, in 1813, of certain free colored people together as a religious society or congregation, the incorporation of their trustees under the general law for incorporating religious societies; that the property of the corporation was held by the trustees “ in trust for the religious uses of the ministers and preachers of the said Union Church, for them and their African brethren and their descendants of the African race, and also for the ministers and teachers of the African brethren duly licensed and ordained according to the discipline adopted by the corporation;” that the trustees with the funds contributed by the members purchased the lot and erected the church, which has always been held “ for the use of the members and ministers of said society, duly licensed and ordained, according to the rules and discipline thereof.” The petition then sets forth the further organization of the church by the election or appointment of officers, with their several functions, according to the discipline, among which were certain officers called elder ministers, “ who were invested with the general superintendence of all the societies composing the African Union Church; and that each elder minister is, under the usage and discipline of said church, by virtue of his office, “ the minister in charge of any so *136 ciety where he may be.” It then states the manner of selecting, appointing, and ordaining elder ministers; the membership, license, ordination to deacon’s office, nomi- , nation, trial sermon, presentation and ordination as elder minister of the petitioner, and his installation, together with Isaac Barney, “ in the charge of the societies composing the said African Union Church;” and that the southern societies, including the original society in Wilmington, fell under his immediate charge and superintendence as elder minister, and still remain under his charge; that, by virtue of said office of elder minister, and according to the usages and discipline of said church, it his duty and right to preach in the said Union Church in Wilmington whenever he may see proper so to do, and to administer the ordinances and discipline thereof. He then complains of his exclusion by the present trustees.
The return traverses none of these facts as facts; but, after objecting to the grant of a mandamus, because the office of elder minister is not an office known to the law, &c., denies generally that the petitioner is an elder minister in the said Union Church, or that it his duty, or right to preach in the said Union Church whenever he may see proper so to do, or to administer the ordinances arid discipline thereof, &c.; and then sets out other provisions of the articles of association, averring that they have not been complied with.
By the rules before stated, this return is insufficient. It does not deny the facts stated in the writ, and it states a. mere conclusion of law;; or, at most, it states only a different constitution without denying the one set up in the petition. It offers nothing tangible, and denies nothing material, which would furnish the relator with any remedy by action, which is his only resort, if-the return be held sufficient. He cannot traverse the return, and the return does not deny the facts upon which he rests his case. He is without remedy, therefore, unless the respondents be held to the established rules in such proceedings, which, for want of a sufficient answer, entitle the relator to a peremptory mandamus.
*137 3. On the general merits of the case growing out of a construction of the constitution and discipline of this church, much doubt has been thrown over my mind by the second argument. The respondent’s position rests on the repeated use of certain expressions in the Articles of Association and Discipline, requiring the consent of the congregations to the induction of a preacher, and showing a fixed opposition to the appointment of preachers over them by a Conference, or any independent power. On this ground they seceded from the Methodist Episcopal Church, which claimed and exercised this power over them, as it still does over all its own societies. The answer to this, given generally in the first, and more at large in the second argument, is this: that the Conference, against whose power they were then contending, was a body which was not a part of their own church organization; it was a body composed of white ministers, in which they were not represented; that, while they threw off its authority, they provided for a similar Conference as a part of their own organization, composed of their own official members, but without defining its powers; that, by constant usage from the beginning, this-body nominated the elder ministers; leaving it still to the-congregations and ruling elders, after trial, to accept or refuse the person nominated; and that the expressions so often repeated, that no preacher should have the right to preach, except to those who were willing to hear him, have reference to a settled and recognized distinction, always existing, between licensed preachers, deacons, and elder ministers.
The Court has always been embarrassed for a sensible and consistent construction of the Articles of Association and Discipline of this church on the face of these papers. They said, on the former argument, “ that it was difficult to understand, from the Articles of Association and Book of Discipline, what distinct' system of church government these people proposed for themselvesbut on these papers they were unable to yield to the distinction contended for between preachers of different grades, and inclined to give *138 force to the exclusion of all preachers, except with the continued consent of the congregations. The practical effect of this construction would he to disorganize the church as a system, and to defeat one of the objects of the association, which was to fqrm a union of churches. The system provides for a Conference, for what purpose, if none of its acts have any effect on the individual congregations, even with their consent, unless by their continuous consent ? It may be doubted whether the Court has heretofore given force to extraneous evidence in ascertaining what was their constitution and discipline. In other cases, usage has been resorted to as a controlling evidence. Even the corporate or denominational name, in connection with the contemporaneous acts of the corporations, has been held a sufficient guide as to the nature of the trust. Miller v. Gable, 2 Denio Rep. 548; The People v. Steele, 2 Barbour’s Rep. 405. Here the denominational name is “ The Union Church of Africans.” The system provides for an association of churches,—for an annual Conference, as a recognized body; and the constant usage, as alleged, and not denied, has been to induct .elder ministers, as the relator claims to have been inducted, viz., by nomination of the Conference, trial sermon, approbation of the ruling elders and congregation, and formal installation, as stated in the petition. Ellis Sanders claims to be the elder minister having charge of this congregation, and entitled to preach in this church, not merely by virtue of the Conference nominar tian, but by the consent of the elders and congregation, given in the usual form after a trial sermon, which, he alleges, is according to the constitution and discipline of the African Union Church. A construction establishing his claim would seem to me better calculated to carry out the general purposes of this church organization, taking in view its proposed objects and its usages hitherto, though upon the face of the very imperfect and confused Articles of Association and printed Book of Discipline alone, such a construction may not be sustained.